# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 23-cr-00142-TL |
| Plaintiff, | MOTION TO SUPPRESS EVIDENCE AND FOR *FRANKS* HEARING |
| v. | |
| KEITH RUSSELL, | Note on Motion Calendar: April 20, 2024 |
| Defendant. | Evidentiary Hearing and Oral Argument Requested |

## I.     MOTION

The defendant, Keith Russell, by and through his attorney, hereby respectfully moves this Court pursuant to Fed. R. Crim. P. Rule 12(b)(3)(C) and the Fourth Amendment to the United States Constitution, for an Order suppressing all evidence seized by law enforcement as a result of the stop of the vehicle he was driving on July 17, 2023. This Motion is supported by the facts and authority set forth in the following memorandum of law, all of the files and records herein, including but not limited to the declaration of counsel and accompanying exhibits, and any

CARNEY GILLESPIE
600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

evidence offered at a hearing on this Motion, which is requested pursuant to local rule of Criminal Procedure 12(b)(9).

## MEMORANDUM OF LAW

### I.    Introduction

Seattle Police Officers French and Lentz stopped Mr. Russell's vehicle on a flimsy basis and then unlawfully extended the duration of the stop without probable cause or reasonable suspicion. As will be shown below and at the evidentiary hearing on this matter, there are significant issues with the officers' credibility in reporting the events of the stop. During the unlawfully extended traffic stop, both officers conducted unlawful warrantless searches of Mr. Russell's vehicle, and the officers ultimately arrested Mr. Russell without probable cause. As a result, all evidence should be suppressed.

### II.    Factual background[1]

On July 17, 2023, at approximately 1:20am, Seattle Police Officers French and Lentz were on patrol together in a marked patrol cruiser. Carney Decl. Exh A[2] at 2. While responding to a dispatched call in the 14100 block of Aurora Ave N., Officer French relates seeing "a white Volvo sedan stopped in the middle of the road on N. 137 St., just east of Aurora Ave N." *Id.* A google street view of the intersection in question shows a quiet side street where the Volvo was allegedly "stopped." Carney Decl. Exh B. Officer French reports seeing the same car again

---

[1] The following facts are based upon the law enforcement reports received to date, the officers' body-worn camera video submitted on a thumb drive, and all facts relevant to the Motion which will be developed at an evidentiary hearing. The pertinent reports and videos are attached as Exhibits to the accompanying Declaration of Christopher Carney in Support of Motion to Suppress Evidence ("Carney Decl."), and physically filed with the Clerk of the Court as reflected in the accompanying Notice of Filing Physical Materials with the Clerk.

[2] Exhibit A appears to be a PDF created by combining multiple documents prior to its production in discovery. As a result, the pagination in the original document frequently restarts at 1. To avoid confusion, the numbering cited throughout this memorandum corresponds to the number of pages in the complete document and will match the pagination of the document created by ECF upon filing.

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

approximately 10 minutes later in the same location, which he viewed as "unreasonable." Carney Decl. Exh A at 2. At no point following the subsequent traffic stop did either officer ever ask Mr. Russell any questions about, or discuss amongst themselves, this allegedly "unreasonable" driving behavior. Carney Decl. Exh F; Exh I.

Upon viewing the Volvo again, the officers turned around just as the driver of the Volvo turned southbound onto Aurora Ave N from N. 137th Street. *Id.* Officer French alleges in his report that there "were no license plates affixed to the vehicle." *Id.* Officer French omits in his report that there was a temporary tag displayed in the rear window of the vehicle. Carney Decl. Exh C. The officers followed Mr. Russell's car for approximately 12 blocks, from N. 137th Streeet to N. 125th Street, and make no mention of any traffic infractions or erratic driving of any kind. Carney Decl. Exh A at 2, 21. As the Volvo neared the intersection of N. 125th Street and Aurora Ave N, the officers initiated a traffic stop. Carney Decl. Exh A at 2; Exh D-E.

Mr. Russell initially intended to turn left onto a side street near the parking lot of the 76 Station that is visible in Exhibits D and E for a safer location but when Officer Lentz activated the patrol cruiser's siren, Mr. Russell was unsure what he was supposed to do so he simply stopped in the left turn lane where he had been attempting to leave Aurora Ave N and waited for officers to approach the vehicle. Carney Decl. Exh A at 2; Exh F at 01:10-01:25. As will be discussed below, the entirety of the interaction was captured by body worn cameras on both officers. Carney Decl. Exh F; Exh I.

Officer French alleges in his report that "the driver appeared to be smoking something," and that he "reached through the sunroof and flicked it out of the car." Carney Decl. Exh A at 2. This account by Officer French is flatly contradicted by the body-worn camera video from

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

Officer Lentz, in which Officer French can be heard saying that he cannot see into the Volvo.[3] Carney Decl. Exh F at 01:30-01:50; 04:36-04:47. In the moments prior to the stop, Officer French can be heard to remark that he saw a hand appear out the sunroof, but did not mention seeing anything thrown. Carney Decl. Exh I at 01:30-01:45. In fact, Mr. Russell was raising his hands in a gesture of surrender. Carney Decl. Exh F at 01:40-02:00.

Perhaps recognizing the questionable nature of this allegation, Officer French notably did not include any reference to seeing Mr. Russell smoking or throwing anything out of the vehicle in his sworn affidavit for search warrants associated with the incident. Carney Decl. Exh G at 5. At no point did either officer's body camera record any smoking debris near Mr. Russell's vehicle. Carney Decl. Exh F; Exh I.

While Officer French claims that Mr. Russell was "yelling at" the officers about where he had intended to pull over, Officer Lentz's body camera shows that Mr. Russell spoke no louder than was necessary to be heard over traffic including a nearby loudly idling motorcycle, had his hands in plain sight out of the driver's window of his vehicle, and spoke calmly and coherently. Carney Decl. Exh F at 01:40-02:00.

Officer French claims that upon contacting Mr. Russell, his "eyes were watery and bloodshot and his eyelids were droopy." Carney Decl. Exh A at 2. In fact, upon contact with Mr. Russell, Officer Lentz's body camera shows that Mr. Russell's eyes were clear and wide open as he made it clear he was not a threat by extending his empty hands out the driver's window. Carney Decl. Exh H. Neither officer paid any attention to the temporary license displayed in the lower left of the inside of the rear window of Mr. Russell's car. Carney Decl. Exh C, F, I.

---

[3] During conversation with Mr. Russell minutes later, Officer Lentz confirmed in his report and contemporaneously stated that the officers had not been able to see anything inside the vehicle before the stop. Carney Decl. Exh A at 21; Exh F at 04:36-04:42.



CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

Within 30 seconds of contacting Mr. Russell, the officers ordered him to exit his vehicle. Mr. Russell questioned why it was necessary to get out of his car in the street, but calmly complied, with his open hands raised. Carney Decl. Exh F at 02:20-02:36. Mr. Russell left the driver's door open with the window down as he exited the vehicle and complied with Officer Lentz's directive to stand against the rear door of the vehicle, whereupon Officer Lentz closed the door behind him. *Id*. Officer Lentz did not ask for Mr. Russell's consent to close the door. *Id.*

At this point, Officer French engaged with Mr. Russell, asking for his driver's license, which Mr. Russell provided. Carney Decl. Exh I at 02:45-03:32. During this time, Officer Lentz twice put his left hand into the vehicle through the open driver's window to shine a flashlight into the vehicle and examine its contents. *Id.* Neither officer asked Mr. Russell's consent for Officer Lentz to perform this search. *Id.*

Mr. Russell provided a valid driver's license and paperwork for the car, which he had recently purchased and of which the officers confirmed that he was the registered owner. Carney Decl. Exh A at 2, 21. Mr. Russell did not have any outstanding warrants. Carney Decl. Exh A at 2.

During the discussion that followed, Mr. Russell coherently explained that he had intended to pull off busy Aurora Avenue N to stop for the officers, and gave his license to Officer French with no fumbling or confusion. Carney Decl. Exh F 02:36-03:46. Mr. Russell explained that he had recently purchased the vehicle and pointed out the temporary tag in the rear window to Officer French, who showed no interest in the tag. *Id*. Mr. Russell offered to get the registration showing he was the registered owner of the vehicle, asking twice if it he should get it out of the car and explaining that it was in the glove box. *Id*. Officer Lentz instructed Mr. Russell

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

to return to the car to get the registration. *Id.* Mr. Russell returned to the driver's seat and retrieved the vehicle registration paperwork. Carney Decl. Exh F 03:46-04:41.

Immediately once Mr. Russell returned to the driver's seat and even though the driver's window was rolled down to allow him to see and talk to Mr. Russell, Officer Lentz positioned his body in the swing space of the driver's door, making it impossible for Mr. Russell to close it without striking him, and shining his flashlight into the vehicle. Carney Decl. Exh F at 03:47-04:00; Exh K. Mr. Russell read through the paperwork briefly, identified the necessary documents, and handed them to Officer Lentz. *Id.* Throughout this interaction, Officer Lentz maintained his position making it impossible for Mr. Russell to close the driver's door. Carney Decl. Exh L. Officer Lentz did not at any time ask for consent to interpose his body into the swing space of the driver's door, to prevent it from being closed, or to place his hand on the interior of the door for any reason. Carney Decl. Exh F at 03:46-05:40.

Throughout the discussion with Officer Lentz, Mr. Russell was occasionally animated but at no point threatening. *Id*. Mr. Russell remained in his driver's seat with his open hands in plain sight, making no sudden or furtive movements. *Id.* Officer Lentz did not appear to find Mr. Russell threatening, and did not at this time instruct him to again the exit the vehicle, or give him any further instruction about his movements or keeping his hands in sight. *Id.* Mr. Russell's speech was appropriate, responsive, and coherent with no slurring or other signs of intoxication. *Id.*

From the point that Mr. Russell re-entered the vehicle to retrieve registration and insurance, one or both of the officers used their bodies or hands to prevent the driver's door from being closed. As Officer Lentz was finishing his review of the paperwork confirming that Mr. Russell was the registered owner of the car, Officer French returned from verifying Mr. Russell's



CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

license and warrant status. Carney Decl. Exh F 05:40-6:46. Officer Lentz confirmed to Officer French that Mr. Russell was the registered owner of the vehicle. *Id.* Officer French quietly asked Officer Lentz a question that began with "So, any…" *Id.*

The remainder of Officer French's question is partially drowned out by traffic noise, but from the immediately subsequent context it certainly appears likely that Officer French was asking Officer Lentz about indications of intoxication. Carney Decl. Exh F 05:40-6:46. Officer Lentz responded "I can't tell, I don't know. He's the registered owner." Immediately following this exchange, Officer French stepped farther into the swing space of Mr. Russell's driver's door, using his left hand to push the driver's door farther open. Carney Decl. Exh F at 06:01-06:04, Exh M. Neither officer asked Mr. Russell's consent to open the door. *Id.* A screenshot of Officer Lentz's body camera showing the view that Officer Lentz had before Officer French opened the door shows that prior to Officer French opening the door wider, the exterior door panel was blocking Officer Lentz's view of the footwell area in front of the driver's seat. Carney Decl. Exh N.

Officer French did not ask consent to place his hand on the inside of the driver's door to push it open. *Id.* As he leaned into the swing space of the driver's door with his left hand on the inside of the door holding it open, Officer French asked Mr. Russell if he had had anything to drink that night. *Id.* Mr. Russell responded in the negative. *Id.* Officer French next asked Mr. Russell if he had smoked any marijuana. *Id.* Officer French falsely claims in his report and in his warrant affidavit that at this point Mr. Russell "admitted he smoked cannabis one hour before we stopped him." Carney Decl. Exh A at 2. In reality, Mr. Russell's response to questioning about cannabis use was to say only "not within the last two hours." Carney Decl. Exh F at 06:04-06:08.

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

By now, the officers had had ample opportunity to ask any questions they might have had about whatever reason they believed they had to stop Mr. Russell, a topic in which they at no point showed any interest. They had verified Mr. Russell's driver's license status, his vehicle registration, and his proof of insurance. Officer Lentz, who had been talking to and observing Mr. Russell throughout the encounter, had related to Officer French that he could not determine evidence of intoxication.

Instead of letting Mr. Russell go, Officer French remained in the driver's door swing area in such a way as to make it impossible for Mr. Russell to close his driver's door, keeping his hand on the inside top of the door to keep it open. Carney Decl. Exh F at 06:08; Carney Decl. Exh J. After Mr. Russell denied smoking cannabis in the preceding two hours, Officer French replied "I ask because I see it in the door," pointing to the map pocket on the inside of the driver's door, which Officer French had opened and was holding open, making the cannabis products visible to Officer French. Carney Decl. Exh F at 06:07-06:20; Exh J. Mr. Russell was 51 years of age at the time of this traffic stop, and thus legally permitted to possess the approximately 4.7 grams of marijuana eventually seized. Carney Decl. Exh A at 2, 11.

Mr. Russell showed Officer French the "blunt," pointing out that it had never been lit and thus could not have been ingested. *Id.* Officer French alleges that Mr. Russell smelled of marijuana and that there were marijuana products in his car. Carney Decl. Exh A at 2; Exh G at 5. This is true as far as it goes, but Officer French conspicuously omitted in his report and in the search warrant affidavit the fact that the marijuana products in the car had never been lit and thus could not have been consumed, though naturally it makes sense that the officers might be able to smell them. Carney Decl. Exh F at 06:07-06:20.



CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

As Mr. Russell was showing the blunt to Officer French, Officer Lentz took advantage of his increased view into the passenger compartment created by Officer French opening the driver's door farther. *Id.* Officer Lentz began shining his flashlight into the driver's footwell area of Mr. Russell's car, searching in the area that he had not been able to see until Officer French opened the door. *Id.;* Carney Decl. Exh O.

After the conversation about the blunt, Officer French asked for permission to search the vehicle. Carney Decl. Exh. I at 06:20-08:48. Mr. Russell pointed out that he had already presented valid license, registration and insurance, and declined to give consent to search his vehicle. *Id.* After Mr. Russell explicitly declined consent, Officer Lentz continued shining his flashlight into the footwell are exposed to his view by Officer French having opened the door, eventually spotting a small dark object under the driver's seat. Carney Decl. Exh Q.

At this point, Officer Lentz immediately raised his voice and ordered Mr. Russell out of the vehicle. *Id.* Mr. Russell, who had already exited the vehicle once under orders from the officers and been instructed to get back in, asked why he had to get out of the car again. *Id.* Officer Lentz raised his voice and repeated his order to get out of the vehicle twice more in rapid succession. *Id.* Officer French, with an unmistakable undercurrent of threat, asked Mr. Russell "are you *refusing* to get out of the vehicle?" *Id.* Mr. Russell explained that he was not refusing anything, just asking why, after he had provided all the necessary information, did he have to get out of the car again. *Id.* After responding that he was not refusing to get out of the car, Mr. Russell did as he was ordered and got out of the car, closing the driver's door behind him. *Id.*

Mr. Russell continued to ask why he was being made to exit the vehicle again, while clearly and emphatically declining consent to search the vehicle. *Id.* Mr. Russell offered to provide a breath sample and perform field sobriety tests, while denying that he was under the



CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

influence. *Id.* Mr. Russell said that he intended to lock the car before walking to the sidewalk, because he did not consent to a search. *Id.* The officers forbade him from doing so. *Id.* The officers took no further actions to accept Mr. Russell's offer to give a breath sample or perform field sobriety tests. *Id.* Instead, following a brief discussion wherein Mr. Russell again denied being under the influence and denied having smoked any marijuana within the past two or more hours, the officers immediately placed Mr. Russell under arrest for DUI. *Id.*

After the officers placed Mr. Russell in the back of their cruiser, they had a brief discussion about what Officer Lentz had seen in the footwell during his search of that area after Officer French opened the driver's door. Carney Decl. Exh F at 13:58-14:33. Their conversation confirmed that Officer Lentz was not able to see the object he believed to be a gun until Officer French moved the door further open. *Id.*

**Lentz**: "There's a gun under the front seat."

**French**: "There is?"

**Lentz**: "That's why I told him to get out of the car[.]"

**French**: "Oh, I didn't know you saw it. Is there really? He's a felon."

[…]

**French**: "I didn't know you saw that."

**Lentz**: "I didn't see it until I said get out of the car."

**French**: "Well, let me know next time."

[…]

**French**: "Probably shouldn't have let him get back in[.]"

**Lentz**: "…he was already in the car when I saw it."

Carney Decl. EXH F 13:58-14:33.



After arresting Mr. Russell, Officer French submitted an affidavit requesting a search warrant for Mr. Russell's blood and vehicle. In the affidavit for the warrant, Officer French made a number of false and misleading statements, as well as material omissions. Carney Decl. Exh G at 5, 13-14. As shown in Carney Decl. Exh F, H, and I, Mr. Russell's eyes were clear and wide open during his interaction with the officers; yet Officer French falsely claimed in the warrant affidavit that Mr. Russell's "eyes were watery and bloodshot, and his eyelids were droopy." Carney Decl. Exh G, at 14. Officer French falsely claimed that Mr. Russell "admitted he smoked cannabis one hour before we stopped him." *Id.* In fact, as discussed above and clearly captured on both officers' body cameras, Mr. Russell *denied* having smoked marijuana within the past two hours and *denied* being under the influence of marijuana. Carney Decl. Exh F at 06:04-06:08; 07:40-08:08. This information was omitted entirely from the affidavit.

While Officer French correctly asserted that there was marijuana in the car, he omitted entirely the highly salient point that Mr. Russell showed him the blunt and pointed out that it had never been lit, leaving the false impression that Mr. Russell had been smoking it as he drove. Carney Decl. Exh G, at 14. Further, Officer French omitted from the affidavit any mention of the fact that the officers followed Mr. Russell on Aurora Ave N for approximately 12 blocks without noting a single traffic infraction or instance of erratic driving. Officer French also omitted the fact that the vehicle had a temporary tag posted in the rear window as it was recently purchased.

With these falsehoods and material omissions, the search warrants were authorized. Mr. Russell's blood was drawn, but the test results remain outstanding, and counsel is told that they are not expected for months to come. The search of the vehicle located the gun that is the subject of this prosecution.

### III.   Analysis



The Fourth Amendment protects against unreasonable searches and seizures of persons, houses, papers, and effects. That protection extends to the vehicle that an individual is driving. A police officer may only stop a vehicle if "the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). We should "note at the outset that warrantless searches and seizures are per se unreasonable and that the Government bears a heavy burden to justify dispensing with the warrant requirement of the Fourth Amendment." *U.S. v. Hoffman*, 607 F.2d 280, 282 (9th Cir. 1979), citing *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S.Ct. 2586 2591, 61 L.Ed.2d 235 (1979).

### A. Avoiding Police or Being in a High Crime Area are not Valid Bases for a Traffic Stop

As a preliminary matter, both officers noted that Mr. Russell turned southbound on Aurora Ave N as they turned around to approach his vehicle with their cruiser. Putting aside their assumption that his turn had anything to do with them, a citizen has the right to ignore or avoid police and this action does not provide a basis for a stop. *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) ("…avoidance of the police, standing alone, does not give rise to a particularized, reasonable suspicion that a person is committing a crime."); *Illinois v. Wardlow*, 528 U.S. 119, 124, (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.").

Similarly, being in a high-crime area such as the Aurora corridor does not provide a basis to stop. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007); *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We note initially that an individual's



CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

presence in a high crime area is *not* enough to support reasonable particularized suspicion that the individual in question has committed or is about to commit a crime.").

**B. An Otherwise Valid Traffic Stop Cannot be Unreasonably Prolonged**

The scope of a traffic or investigatory stop "must be carefully tailored to its underlying justification" and "last no longer than is necessary to effectuate the purpose of the stop." *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492, (2015), citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Like a Terry stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop[.]" *Rodriguez*, 575 U.S. at 354. Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Sharpe*, 470 U.S. at 686 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

**1. Once the Officers Confirmed the Presence of a Temporary License Plate, the Traffic Stop Was Required to End**

Though it appears to be an issue of first impression in the Ninth Circuit[4], the majority[5] of states and federal circuits, including Washington State, have determined that if a stop is based on a missing or defective license plate, the Fourth Amendment requires officers to terminate the

---

[4] See *United States v. Ngumezi*, 980 F.3d 1285 (9th Cir. 2020)(Noting issue of dissipation of probable cause for license plate violation when proof of sale displayed, but deciding the case on other grounds without discussion of license plate issue).
[5] See *State v. Coleman*, 890 N.W.2d 284, 293 (Iowa 2017)( Supreme Court of Iowa, surveying cases)(regarding traffic stops continuing after license plate issue resolved, "the majority of the cases have held that once the underlying reason for a traffic stop has been resolved, it cannot be lawfully extended.")

**MOTION TO SUPPRESS AND FOR**
***FRANKS* HEARING**
**U.S. v. Russell 23-cr-00142-TL**
**Page 13 of 23**

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

stop immediately once they discover that there was in fact a valid license plate. <u>See</u>, e.g., *State v. Creed*, 179 Wash.App. 534, 319 P.3d 80 (Wash. App. 2014).

In *Creed*, the Washington Court of Appeals cited with approval *State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237 (1984):

> In that case, police stopped a vehicle because it had neither a front nor a back license plate. As the officer approached the vehicle, he noticed a temporary license plate beneath the rear window, which was consistent with state law. The question in *Chatton* was whether the police officer had "continuing justification to detain [the driver] and demand production of his driver's license" once the officer observed the temporary tags in the rear of the vehicle. *Id.* at 60–61, 463 N.E.2d 1237. The Ohio Supreme Court held that he did not.
>
> […]
>
> *Chatton* observed that "as a matter of courtesy, [the officer] could have explained to [the driver] the reason he was initially detained" and sent him on his way. 11 Ohio St.3d at 63, 463 N.E.2d 1237. That sort of momentary, entirely noninvestigative contact would have been reasonable here, too. What *Chatton* held the officer could not do, and what was unlawful here, was to "unite [a] search" to that courtesy contact—in *Chatton,* by asking the driver to produce his driver's license. *Id.*

*Creed*, 319 P.3d at 84-85.

This analysis has been widely adopted in both state and federal jurisdictions.[6] The United States Court of Appeals for the Tenth Circuit has led the way in considering several traffic-stop cases in which the stop was extended after the underlying purposes were resolved. In *United States v. Edgerton*, the Tenth Circuit considered a case in which a vehicle was stopped because a temporary registration tag could not be read because of darkness. *Edgerton*, 438 F.3d 1043, 1044 (10th Cir. 2006). The Tenth Circuit held, however, that once the trooper was able to read the temporary tag, the trooper "as a matter of courtesy, should have explained to [the] Defendant the

---

[6] <u>See</u> *Coleman,* supra note 4 (collecting cases).

CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Id*. at 1051.

In *United States v. Peña-Montes*, 589 F.3d 1048 (10th Cir. 2009), the court confronted the familiar situation in which an officer pulled over a vehicle believing it lacked a license plate, only to discover that the vehicle had a "dealer tag." *Id*. at 1049. The officer did not end the stop at that point, but continued his investigative activities, questioning a passenger about his immigration status. *Id*. at 1051. The *Peña-Montes* court concluded that no additional reasonable suspicion was present, and that the stop should have been terminated once the dealer tag was discovered. *Id*. at 1058. In response to the government's argument that it is reasonable for officers to enquire about dealer tags after a traffic stop even if they appeared lawful, the *Pena-Montes* court declared, "We decline to sign this blank check." *Id*.

In similar circumstances arising from a temporary registration displayed in the rear window of a vehicle, the Tenth Circuit in *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) held that the court held that once the officer had the opportunity to inspect the temporary registration "further detention of the vehicle to question [the defendant] about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification."

In addition to the Tenth Circuit, Washington and Iowa cases mentioned above, the Fifth Circuit[7] and Sixth Circuit[8] have issued similar holdings, as have federal courts in California[9],

---

[7] *United States v. Valadez*, 267 F.3d 395 (5th Cir. 2001)("Further detention was not lawful after the point at which the purposes of the stop was resolved...").
[8] *United States v. Jones*, 479 Fed.Appx. 705, 712 (6th Cir. 2012)(Officer exceeded the scope of a traffic stop for failure to display proper license plates when he detained the driver after he observed a lawful temporary tag in plain view.); see also *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants[.]").
[9] *Hutton v. City of Berkeley Police Dep't*, 2014 WL 4674295, Case No. 13-cv-03407-JCS (N.D. Cal. Sep 09, 2014).

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

Louisiana[10], Ohio[11], Iowa[12], Texas[13], and New Mexico[14], as well as the Supreme Courts of

Florida[15] and Colorado[16], along with state appellate courts[17] in Indiana, Kansas, Maryland, South

Carolina, Texas, and Utah.

In this case, the temporary plate in Mr. Russell's car would have been visible to both

officers before they approached his door. Carney Decl. Exh C. Furthermore, once Mr. Russell

was ordered out of the car, he literally tapped the back window to point it out to Officer French,

who could not have been less interested. Once the officers saw, or in the exercise of reasonable

diligence should have seen, the temporary tag, their authority to detain Mr. Russell dissipated

and he should have been allowed to move along his way without being asked any further

---

[10] *United States v. Smith*, 37 F.Supp.3d 806, 808 (M.D. La. 2014)(Once license plate issue was resolved, there was no further basis to detain the driver).

[11] *U.S. v. Elmore*, 177 F.Supp.2d 773 (S.D. Ohio 2001)("The Court finds, however, that as soon as Officer Robinson discerned a temporary license properly displayed in the rear window, the traffic stop should have ended.")

[12] *United States v. Wise*, 418 F.Supp.2d 1100, 1102, 1108 (S.D. Iowa 2006)(Deputy unlawfully detained the defendants when they asked for identification and brought one of the defendants back to the police car after license plate issue resolved because his investigation was no longer related to the purpose of the stop.)

[13] *United States v. Salinas*, 665 F.Supp.2d 717, 718–19, 721 (W.D. Tex. 2009)(Officers could have determined even before they asked for the driver's license and proof of insurance that there was not a violation of the Texas license plate requirement. Because "[t]hey did not encounter reasonable suspicion of an additional violation—driving without a license—until after his traffic stop for failure to display a front license plate should have ended," the evidence should have been suppressed.)

[14] *United States v. Castro*, 929 F.Supp.2d 1140, 1152 (D.N.M. 2013) ("[O]nce the officer's suspicion that a traffic violation occurred is dispelled, prolonging the detention by retaining the defendant's identification, questioning the defendant further, or waiting for the outcome of a computer check, even if the check is in progress, is improper and a violation of the Fourth Amendment.")

[15] *State v. Diaz*, 850 So. 2d 435, 438-439 (Fla. 2003)(Cert. denied, 540 U.S. 1075 (2003))(Once the officer had the opportunity to inspect a temporary tag "the purpose for the stop was satisfied, and the continued detention of Mr. Diaz was improper.")

[16] *People v. Redinger*, 906 P.2d 81, 85–86 (Colo. 1995) (en banc)(Once license plate inspection complete, "there is no justification for continued detention and interrogation of citizens.").

[17] See Holly v. State, 918 N.E.2d 323, 326 (Ind. 2009); State v. Diaz-Ruiz, 211 P.3d 836, 42 Kan.App.2d 325 (Kan. App. 2009); Ferris v. State, 355 Md. 356, 735 A.2d 491, 500 (1999); State v. Pichardo, 367 S.C. 84, 623 S.E.2d 840, 852 (Ct. App. 2005); Davis v. State, 947 S.W.2d 240, 245–46 (Tex. Crim. App. 1997) (en banc); State v. Morris, 259 P.3d 116, 124 (Utah 2011).

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

questions. All the pertinent evidence in this case was discovered after this point in time and thus should be suppressed.[18]

## C. The Officers Unlawfully Searched Mr. Russell's Car

As discussed above in Section B, the officers here had no valid basis for continuing to detain or investigate Mr. Russell once they had the opportunity to inspect his temporary tag. However, even if they had had a valid basis to continue his detention, the officers conducted unlawful searches during their subsequent investigation.

### 1. Police Officers Cannot Lawfully Control the Doors of a Detained Vehicle or Intrude into the Vehicle

The United States Supreme Court has held that "a car's interior as a whole is... subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class*, 475 U.S. 106, 114-115, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). This holding means that "a physical intrusion into the interior of a car constitutes a search." *Ngumezi*, 980 F.3d at 1288. In *Ngumezi*, an officer leaned into an open window of a car, or alternatively first opened the door and leaned inside the car, depending on which testimony was believed. Either way, the Ninth Circuit held that in contrast to simply shining a flashlight into the vehicle from outside, the "officer entered the interior space of the vehicle when he leaned in across the plane of the door." *Ngumezi*, 980 F.3d at 1289. Concerning this intrusion, the Ninth Circuit held that

> As several recent Supreme Court decisions have confirmed, that physical intrusion is constitutionally significant: "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred."[19]

---

[18] "[I]f either the initial traffic stop or the scope and duration of the stop was unlawful, the evidence and statements obtained from that illegality must be excluded as 'fruit of the poisonous tree.'" *United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

[19] *Ngumezi*, 980 F.3d at 1289 (citing *Florida v. Jardines*, 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012); see *Jones*, 565 U.S.



CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

The *Ngumezi* court acknowledged that "[a]lthough the intrusion here may have been modest, the Supreme Court has never suggested that the magnitude of a physical intrusion is relevant to the Fourth Amendment analysis." *Ngumezi,* 980 F.3d at 1289. Rather than a test assessing the magnitude of the intrusion, the court elected to "apply a bright-line rule" that "opening a door" and "entering the interior space of a vehicle" clearly "constitutes a Fourth Amendment search." *Id.*

### 2. An Object is not in "Plain View" if Police Officers Must Perform an Unlawful Intrusion or Move Other Objects in Order to See It

While it is true that police may seize items found in "plain view," "seizure is not necessarily justified merely because the object appeared in 'plain view' in the course of a search," because logically every item seized had to have been in "plain view" immediately before it was seized. *U.S. v. Bulacan*, 156 F.3d 963, 968 (9th Cir. 1998). Therefore, "the Supreme Court has limited warrantless seizures under the 'plain view' doctrine to situations where the officer had a legal right to be at the location from which the object was plainly viewed." *Id.*, citing *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). "In addition, to justify the seizure, the incriminating nature of the object must be immediately apparent and the officer must 'have a lawful right of access to the object itself.'" *Id.*

This limitation of lawfully being in a place from which an officer can plainly view an object to be seized extends to a prohibition on moving other objects in order to view it. *U.S. v. Washington*, 387 F.3d 1060, 1071 (9th Cir. 2004)(citing *Arizona v. Hicks*, 480 U.S. 321, 326,

---

at 408 n.5, 132 S.Ct. 945 (explaining that a physical intrusion "conjoined with ... an attempt to find something or to obtain information" constitutes a search)).



107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)). The *Washington* court explained that *Hicks*[20] stands for the proposition that "moving something even a few inches constitutes a search and falls within the plain view exception only if the officer had probable cause to believe the thing being moved is evidence of a crime at the time he moved it." In *Washington*, the officers simply picked up a coat and saw methamphetamine. *Washington*, 387 F.3d at 1071. Moving the coat was an unconstitutional search unless supported by consent or probable cause. *Id.*

Similarly, the *Washington* court held that "plain view" does not authorize officers to act without lawful authority to keep the door to a protected area open, and then use that line of sight to claim "plain view" of contraband:

> After Washington's friend, Nolan, exited the room, the officers refused to let Nolan close the door[.] Officer Sceirine testified that, with the door open, the officers "had a fairly ample view of the room." Whether a hotel room door is opened in response to a threat or a command or is kept open against the wishes of the room's occupant, police officers obtain visual access to the room by using their power to require that the door *be* open. Both scenarios result in a search within the meaning of the Fourth Amendment, and both scenarios require consent, a warrant, or probable cause plus an exception to the warrant requirement. Here, the officers possessed none of these legal grounds for gaining visual access to Washington's room. Thus, the officers violated Washington's Fourth Amendment rights when they gained visual access to his room by refusing to let Nolan close its door.

*Washington*, 387 F.3d at 1070-1071.

During their detention of Mr. Russell, both officers conducted unlawful searches. First, Officer Lentz physically intruded "across the plane of the door" multiple times, reaching through the open window to shine his flashlight around the interior of the vehicle. Carney Decl. Exh I at 02:45-03:32. Second, as discussed in Section II, supra, the officers asserted total control over whether the driver's door was open or closed throughout the stop, without asking for consent or

---

[20] "[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry." *Hicks*, 480 U.S. at 325.

**MOTION TO SUPPRESS AND FOR**
***FRANKS* HEARING**
**U.S. v. Russell 23-cr-00142-TL**
**Page 19 of 23**

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

having probable cause. Finally, Officer French physically moved the driver's door in order to see and question Mr. Russell about the never-lit, legal marijuana products in the map pocket. It was this last search by Officer French that most clearly tainted the subsequent discovery of the gun; the body camera video and Officer Lentz's own words make it clear that he was unable to see the gun until Officer French took it upon himself to move the door and create a line of sight for Officer Lentz to see the gun. All of these actions of controlling and opening the door were unlawful searches and defeat any claim of plain view of the gun, as described in *Washington*. Accordingly, the discovery of the gun is tainted and it must be suppressed.

### D. There was no Probable Cause for Marijuana DUI

In *USA. v. Patzer*, 277 F.3d 1080 (9th Cir. 2002), officers arrested a driver for suspicion of driving while intoxicated based on their belief that he had consumed marijuana. The officers noted that the driver "appeared to have bloodshot and glassy eyes," making them suspect that he had smoked marijuana. *Patzer*, 277 F.3d at 1081. The driver admitted that he had smoked marijuana earlier in the day. *Id.* Nevertheless, the Ninth Circuit focused on the driver's "driving and comportment" and found that this evidence, without more, fell short of probable cause to believe that the driver's ability to drive was impaired by the marijuana he had admittedly consumed. *Patzer*, 277 F.3d at 1084. The court suppressed all evidence recovered incident to the arrest.

Similarly, here, Mr. Russell forthrightly acknowledged that he had smoked some amount of marijuana more than two hours prior to driving. Officer French claims that Mr. Russell's eyes were watery and bloodshot, though this is contradicted by the video evidence. Regardless, even taking as true Officer French's claims about Mr. Russell's eyes, this is not sufficient for probable cause to believe that Mr. Russell's ability to drive was impaired. Like the driver in *Patzer*, Mr.


CARNEY GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

Russell's driving and comportment were within normal ranges and do not supply the necessary probable cause to arrest for marijuana DUI or to support the search warrant for his blood. All evidence recovered incident to his arrest and the execution of the search warrant should be suppressed.

### E. Mr. Russell is Entitled to a Hearing Pursuant to *Franks v. Delaware*

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir. 1980). The *Franks* rule applies both to affirmative misrepresentations and to omissions of fact in the affidavit. *United States v. Stanert*, 762 F.2d 775, 780–781 (9th Cir. 1985), *opinion amended,* 769 F.2d 1410. The danger in omissions from an affidavit for search warrant are set forth in *Stanert*:

> The use of deliberately falsified information is not the only way by which police officers can mislead a magistrate when making a probable cause determination. By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.

*Stanert*, 762 F.2d at 781.

The Court in *Stanert* stated, in describing the showing necessary to obtain a hearing:

> Clear proof of deliberate or reckless omission is not required. *See United States v. Chesher*, 678 F.2d 1353, 1362 (9th Cir. 1982). Such proof is reserved for the evidentiary hearing. *Id.* At this stage, all that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading.

*Id.*



The next issue in a *Franks* analysis is whether the omitted information or false statements were essential to the finding of probable cause. Once a *Franks* violation is established, the remedy is to include the omitted information and exclude the false statements from the affidavit and then determine probable cause. *United States v. Condo*, 782 F.2d 1502, 1506 (9th Cir. 1986). The district court must review the reformed affidavit and make a *de novo* determination of probable cause, without the usual deference to the issuing magistrate. *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007). Where there are sufficient credibility problems with the informant, the entirety of the informant's statements should be disregarded. *United States v. Hall*, 113 F. 3d 157, 159 (9th Cir. 1997).

As discussed in Section II, *Supra,* Officer French made a number of material false statements and omissions from his search warrant affidavit. Based on these material false statements and omissions, Mr. Russell is entitled to a *Franks* hearing to determine if the affidavit should be redacted and re-evaluated *de novo* for the existence of probable cause. In light of the holding of *Patzer*, supra, this Court should then find that the redacted affidavit does not support probable cause and suppress all evidence recovered during the execution of the warrant.

## IV.    CONCLUSION

Officers French and Lentz unlawfully prolonged the stop of Mr. Russell's car, conducted unlawful searches of his car, arrested him in the absence of probable cause, and then procured a warrant by means of an affidavit riddled with false statements and omissions. All evidence should be suppressed.

DATED this 5th day of April, 2024.

Respectfully submitted:

s/Christopher Carney
Christopher Carney, WSBA #30325



CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com

Attorney for Defendant Keith Russell
600 1st Ave
Seattle WA 98104
Tel. 206-445-0212
Christopher.Carney@carneygillespie.com

CARNEY
GILLESPIE

600 First Ave, Suite LL08
Seattle, WA 98104
206.445.0220 MAIN
206.238.9987 FAX
carneygillespie.com