UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH RUSSELL,<br><br>Defendant. | NO. CR23-142 TL<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS AND MOTION FOR *FRANKS* HEARING |

## I. INTRODUCTION

Russell seeks suppression of evidence obtained as a result of the stop of his vehicle, specifically the firearm recovered and the results of his blood draw. Russell further moves for a *Franks* hearing. The motions should be denied. The officers observed Russell commit traffic infractions, which led to a lawful investigation into driving under the influence (DUI), which resulted in the discovery of Russell's illegal possession of a firearm stored in plain view. Any supposed mistakes, discrepancies, and deficiencies in the affidavit for the warrants are inconsequential and irrelevant, and do not impact probable cause. All of Russell's complaints about the affidavit are simply *de minimis* in nature. Additionally, Russell has failed to make a substantial showing that the affiant intentionally or recklessly made false or misleading statements or omissions in support of the warrant. Since Russell has failed to make a preliminary showing of both *falseness* and *materiality* a *Franks* hearing is unwarranted.

## II.    PROCEDURAL HISTORY

On August 9, 2023, Russell was charged with Unlawful Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). The King County Prosecutor's Office originally charged Russell with Unlawful Possession of a Firearm and Driving Under the Influence on July 19, 2023. Charges were dismissed in lieu of federal prosecution in light of Russell's criminal history which includes federal convictions for Possession With Intent to Distribute (CR10-264 MJP) and Unlawful Possession of a Firearm (CR96-272D-001). Russell made his initial appearance on August 21, 2023, and was detained on August 24, 2023. Dkts. 7, 12. A Grand Jury indicted Russell for Unlawful Possession of a Firearm on September 6, 2023. Dkt. 15. Trial is scheduled for June 3, 2024. Dkt. 27.

## III.    FACTUAL BACKGROUND[1]

On July 17, 2023, at approximately 1:20 a.m. Seattle Police Department Officers Lentz and French were patrolling the area of Aurora Avenue in Seattle, Washington, when they noticed a white Volvo sedan stopped in the middle of the roadway just east of Aurora on NE 137th Street, Seattle without hazard lights displayed and with the engine running. Dkt. 36-1 at 1, 21. This location is outside of a hotel off of Aurora Avenue, Seattle. The hotel owner filed complaints with Seattle Police concerning cars parking on the street, blocking traffic, and creating a road hazard. *Id.* After observing the Volvo at 1:20 a.m. and responding to a 9-1-1 call, Officers Lentz and French again observed the same white Volvo sedan stopped in the middle of the road at the same location without hazard lights displayed and with the engine running at approximately 1:30 a.m. *Id.* Stopping in the roadway is an infraction.[2] The Volvo did not have a rear license plate and

---

[1] The factual background is drawn from the officer's reports (Dkt. 36-1), fleet camera footage from the lead patrol car (Exhibit A), body worn camera footage of Officer French (Exhibit B), body worn camera footage of Officer Lentz (Exhibit C), and Seattle Municipal Court Affidavit, Warrant, and Judicial Authorization (Dkt. 36-7).

[2] Seattle Municipal Code Chapter 11.72.000 - Provisions of chapter prohibit stopping, standing and parking—Exceptions**.** The provisions of this chapter prohibit or restrict the stopping, standing, parking or angle parking of a vehicle at all places and times as herein specified or as indicated by official traffic-control devices, except when necessary to avoid conflict with other traffic or to comply with the law or the directions of a peace officer or traffic-control devices. (RCW 46.61.570)

a temporary license was not visible (see fleet cam dash as depicted in figure 1 below). *Id.*, Ex. A at 1:42. Having neither a rear license plate, nor a visible temporary license is an infraction of the Seattle Municipal Code.[3]



*Figure 1*

The Volvo quickly pulled away when the officers turned around to contact the driver. Fleet camera footage captured their second observation of Russell stopped in the roadway and his subsequent departure from the area as the patrol car turned around to make contact. *Id.* :00-.24; Dkt. 36-1 at 1, 21.

The officers activated the patrol vehicle's emergency lights and attempted to conduct a traffic stop of the Volvo as it pulled onto Aurora Avenue North. Instead of pulling over to the right and onto the shoulder of the road, Russell pulled into the turn lane on North 125th Street and Aurora Avenue and came to a stop. *Id*. 00:24 – 1:51. Fleet camera

---

[3] Seattle Municipal Code Chapter 11.22.080 - Vehicle license plates displayed.  Display requirements. No person shall operate any vehicle on any street or alley unless a valid license plate or plates are attached thereon as required by RCW 46.16A.200. The vehicle license plates shall be attached conspicuously at the front and rear of each vehicle for which the same are issued but if only one (1) license plate is legally issued for any vehicle such plate shall be conspicuously attached to the rear of such vehicle. Each vehicle license plate shall be placed or hung in a horizontal position at a distance of not more than four (4) feet from the ground and shall be kept clean so as to be plainly seen and read at all times; this requirement shall not apply in cases where the Washington state patrol has granted permission to deviate therefrom, as provided in RCW 46.16A.200.

footage documented Officer French informing Officer Lentz that he observed Russell stick his hand out of the sunroof. *Id.* at 1:41. Officer French's report also documents his observation, specifically, "the driver appeared to be smoking something. He reached through the sunroof and flicked it out of the car." Dkt. 36-1 at 2.[4]

Both officers noticed "a strong smell [of] cannabis inside the car" when they first approached the Volvo. Dkt. 36-1 at 2; 21; Ex. B at 1:56. Russell, the driver and sole occupant of the Volvo, was animated about the stop initially. His agitation increased throughout the stop and culminated in yelling at the officers, being belligerent, physically uncooperative, and calling for a citizen/friend to take his car. *See* Ex. A at 9:15-10:58, Ex. B at 1:56-1210; Ex. C at 1:52-12:10.

Both officers instructed Russell to "get out of the car" after speaking to him for approximately thirty seconds after each noticed the "strong smell" of marijuana. Ex. B at 1:53-2:21, Ex. C at 1:56-2:21. Russell responded by stating, "Get out of the car, I have license and insurance." Ex. C at 2:23. Officer Lentz responded, "Ok, great. Step out of the vehicle." Ex. C at 2:28. Officer Lentz documented that once Russell opened the driver's door, he could see cannabis products in the side door compartment. Dkt. 36-1 at 21.

Russell stepped out of his car, and Officer Lentz shut the car door. Ex. C at 2:33. During the next five minutes, Russell repeated that he had a license and insurance *no less than eighteen times*, regardless of the questions imposed or the instructions given by the officers. Eventually, Officer French informed Russell, "we stopped you because you can't sit in the middle of the road… we tried to pull you over and you just decided to stop here." Ex. B at 2:48. Again, Russell responded that he has license and registration and asked if he can "grab it," to which Officer French says, "not yet." Ex. C at 3:40.

When Officer French returned to the patrol car with Russell's identification to run his information with dispatch, Russell spoke with Officer Lentz about retrieving his

---

[4] Though Russell claims the body worn camera footage "flatly" contradicts Officer French's observation of Russell tossing something out of the sunroof, the camera angle and quality is not sharp enough to make such a statement. Considering the contemporaneous statement of Officer French's observations with the additional discussion of the officers' inability to see inside the vehicle well (as opposed to outside of the sunroof area), Russell's argument fails.

registration and then sat down in the driver's seat. Ex. C at 3:44. At that point, Officer Lentz did not instruct Russell to get back out of the car. Officer French later told Officer Lentz that Russell should not have been allowed to get back into the (running) car.[5] Ex. B at 14:26.

While Russell was seated behind the driver's seat, Officer Lentz informed him the reason for the "extra stuff going on" (i.e. questions from the officers) was "because of the way you pulled over, you made us really nervous" and continued to explain the officers "couldn't see what was going on inside the vehicle because the windows are so tinted." Ex. B at 4:30. Officer Lentz flatly informed Russell of his concern, "it is really common for people in this type of situation we try to pull them over and then maybe they hide drugs and guns and other things." *Id*. at 5:00. Notably, the Volvo's door remained open the entirety of the time. Russell's left foot remained outside of the car resting on the ground. Neither Officer French nor Officer Lentz are depicted forcing open Russell's car door or attempting to search the inside of the Volvo during the nearly six-minute traffic stop turned DUI investigation. In fact, Russell is the person responsible for opening the door when he re-entered the Volvo to collect his registration after Officer French had instructed him not to do so. Officer French learned that Russell is a convicted felon while confirming Russell's driving status and identification with dispatch. Ex. C at 14:12.

When Officer French returned to the Volvo with Russell's license, he inquired of Officer Lentz about whether or not he could tell if Russell was impaired. *Id*. at 5:53. Officer French asked Russell if he had "anything to drink or smoked any marijuana" *Id*. at 6:02. Again, the Volvo's door remained open and Russell's left foot remained outside of the car. Russell explained he had not smoked marijuana "for the last two hours." *Id*. at 6:08. But Officer French had also observed a bag of marijuana and a blunt in the driver side door. Dkt. 36-1 at 2.

---

[5] After smelling a strong odor of cannabis emanating from inside the Volvo, the officers were investigating Russell for DUI. In addition to safety concerns officers have during traffic stops, allowing an impaired person to sit behind the wheel of a running car put Russell in physical control of the running Volvo. *See* RCW 46.61.504. Officer French did not think the Volvo's engine was off during the period of time Russell was seated behind the wheel. *See* Ex. B at 15:58.

At that point, Officer Lentz repeatedly asked Russell to get out of the car and to "please get out of the car." Ex. C at 6:28. Unbeknownst to Officer French, Officer Lentz was facing Russell and saw a firearm underneath the driver's seat in plain view. His body worn camera footage captured a clear view of a pistol grip underneath the driver's seat as depicted in figures 2 and 3 below. Ex. C at 6:24 and 6:40 respectively; Dkt. 36-1 at 21.



*Figure 2*



*Figure 3*

//
//

Officer Lentz later informed Officer French that he saw the gun in the car, but said nothing because he did not want Russell reaching for it. Ex. C at 13:32.

Russell immediately shut the Volvo door when he exited the second time. Ex. C at 6:45. Officers informed Russell that he was being investigated for DUI. *Id*. at 6:52. In addition to *repeatedly* stating he had a license and insurance and that he was not allowing the officers to enter the car, Russell stated he was going to lock his car. Russell refused to walk to the sidewalk with officers. *Id*. at 7:33. Russell explained the last time he had marijuana was "a while maybe 2-3 hours ago" and that he did not have "any marijuana in a while." *Id*. at 7:42. Then Russell reported he smoked a blunt earlier in the day. *Id*. at 8:00. Officer French informed Russell he must have smoked some more recently and noted Russell's eyes were red and watery and that he smelled marijuana in the car and saw it in the car. *Id.* at 8:13; Dkt. 36-1 at 2.

Russell was arrested for DUI. *Id*. at 8:47. The period of time from contact at the window with Russell for driving infractions, to the DUI investigation, to Russell's ultimate arrest was approximately six minutes (Ex. B at 1:56-8:13).

During a search incident to arrest, what appears to be a marijuana blunt was removed from Russell's pocket and placed on the hood of the patrol car as depicted below in Figure 4.[6]

//

//

---

[6] This apparent marijuana blunt was not documented in the incident reports.



*Figure 4*

Officer French was tasked with obtaining warrants authorizing a blood draw and to search the car for the firearm Officer Lentz observed. Dkt. 36-1 at 2-3. Officer French prepared the affidavits for search warrants and provided the same information as was contained in his incident report. Officer French wrote that Russell admitted to smoking cannabis *one* hour before being stopped. Dkt. 36-7 at 5, 13-14.

After obtaining judicial approval for both warrants, Officer French transported Russell to Northwest Hospital for a blood draw.[7] Dkt. 36-1 at 2. Officers Lentz and Hogg executed a warrant on Russell's Volvo and recovered a Walther 9mm semi-automatic handgun underneath the driver's seat where Officer Lentz reported observing it. The gun was stolen, loaded with ammunition, and appeared to be fully functional as depicted in Figure 5. *Id*.

//

//

---

[7] The Washington State Patrol Crime Laboratory results are pending despite repeated requests for expedited testing.



*Figure 5*

## IV.    ARGUMENT

Russell's traffic infractions formed a legal basis for officers to stop his Volvo. Once stopped, officers formed reasonable suspicion that Russell was driving under the influence and commenced a criminal inquiry into the commission of that crime. During the course of the DUI investigation, Officer Lentz observed a firearm underneath the driver's seat, where Russell re-seated himself after being instructed to exit the Volvo. Following his arrest for DUI, Officer French obtained a warrant to search the Volvo for the firearm and for a sample of Russell's blood. Neither the initial traffic stop, subsequent DUI investigation, nor the application for search warrants run afoul of the Fourth Amendment. Russell's motions to suppress on these grounds should be denied.

Russell specifically seeks to suppress all evidence obtained during law enforcement's contact with him, which includes a blood draw and Walther PPS 9mm semi-automatic pistol recovered from his Volvo alleging Officer French recklessly misstated and omitted material facts resulting in the issuance of unsupportable search warrants for blood and the firearm. Russell's motion relies on five claimed errors in Officer French's affidavits, specifically alleging the following: (1) Russell's eyes were watery and bloodshot, and his eyelids were droopy; (2) Russell admitted he smoked cannabis *one* hour before being stopped; (3) omitting that Russell showed the blunt and it had not been lit; (4) omitting mention of the fact officers followed Russell for twelve blocks without noting a single traffic infraction or instance of erratic driving; and (5) omitting the temporary tag was posted in the rear window.

Russell attempts to turn these claimed errors into a calculated attempt on Officer French's part to mislead a judge to issue the warrants which resulted in the seizure of evidence. However, these affidavits more than established probable cause, even with the small, alleged mistakes or omissions. Russell's arguments therefore do not support a request for a *Franks* hearing, much less suppression. In the alternative, the good faith standard applies here. Therefore, Russell's motion should be denied.

## V.     LEGAL AUTHORITY

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such investigatory stops are justified by "reasonable suspicion" that criminal activity may be afoot. *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744; *see also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Cortez,* 449 U.S. at 417, 101 S.Ct. 690. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions ... but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct.

1826, 16 L.Ed.2d 908 (1966). The "touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citations omitted).

**A. Russell's Traffic Violations Provided A Valid Basis For The Stop.**

Because traffic stops are equivalent to pedestrian encounters, the same objective "reasonable suspicion" standard applies. *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). As with a *Terry* stop, the reasonable suspicion for a traffic stop is based on the totality of the circumstances. *Id.* (citing *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

A police officer may stop a vehicle if there is probable cause to believe a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 , 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In *Whren,* a unanimous Supreme Court held that a stop was reasonable under the Fourth Amendment where officers had probable cause to believe that the petitioner violated the traffic code, even if the ultimate charge was not related to the traffic stop. *Id.* at 808–09. Police observed a truck in a "high drug area" stopped at stop sign for an excessive amount of time, which then turned without signaling and sped off at an excessive speed. *Id.* at 808. Once the police caught up to the vehicle, the officers observed Whren, one of the passengers, holding two large bags of what appeared to be crack cocaine. Whren argued that the stop had not been justified by probable cause to believe that the occupants were engaged in illegal drug activity, and that the officers' asserted ground for approaching the vehicle, which was to give them a warning about traffic violations, was pretextual. *Id.* at 809.

The Supreme Court held that the officers had probable cause to believe that various provisions of the traffic code had been violated. *Id.* at 810. The Court specifically declined to hold that the Fourth Amendment test for traffic stops should be "whether a police officer, acting reasonably, would have made the stop for the reason given." *Id.* Rather, the Court explained that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth

Amendment analysis," and that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id.* at 813, 116 S.Ct. 1769. *Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose. *See also Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593–94, 160 L.Ed.2d 537 (2004) ("[The] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

The evidence available to the officers to support at least reasonable suspicion to stop Russell for his traffic violations is overwhelming. By the time the officers pulled Russell over, they had observed the following: (1) from approximately 1:20 a.m. until 1:30 a.m. Russell stopped his running Volvo in the middle of a city street without displaying hazard lights; (2) Russell quickly left when officers turned the patrol car around to contact him; (3) Russell had no license plate displayed and his tinted windows prevented the temporary license from being visible; (4) Russell failed to pull over to the right and instead stopped in the left turn hand lane on Aurora Avenue, a busy thoroughfare; and (5) Russell flicked an item outside of his sunroof before officers made contact. Russell's claim fails.

**B. Officers Had Reasonable Suspicion to Detain and Subsequently Arrest Russell on Suspicion of DUI.**

"During a traffic stop, a police officer is allowed to ask questions that are reasonably related in scope to the justification for his initiation of contact." *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001) (citing *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996)). A valid traffic stop "can become unlawful if it is prolonged beyond the time reasonable required to complete [the] mission [of issuing a ticket]." *See Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). However, a period of detention may be "permissibly extended because new grounds for suspicion of criminal activity continue[] to unfold." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005).

"An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop" but he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). Typically, the ordinary inquiries incident to a traffic stop "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse*, 440 U. S. 648, 658–60 (1979)). However, "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842(2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)).

To justify conducting an investigatory stop, an officer must be able to point to specific, articulable facts, which taken together with rational inferences from those facts, form the basis for suspecting that the particular person detained engaged in criminal activity. *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). This "reasonable suspicion" necessary to justify such a stop depends "upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). For example, an "alert" by a "certified, reliable narcotics dog [is] sufficient, even by itself, to support a finding of probable cause" for an arrest. *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003) (citing *United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993)). Moreover, law enforcement officers have the duty to arrest a person if they have probable cause to believe such person is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223 (1964).

Russell claims the officers violated his Fourth Amendment rights and unlawfully searched his Volvo when they continued to question him after determining he possessed a temporary permit (ignoring his violation of SMC Ch. 11.72.000 prohibit stopping,

standing and parking). In doing so, Russell fails to acknowledge blatant evidence of impairment: (1) his failure to pull off to the right side of the road and stopping in the middle of Aurora Avenue; (2) flicking something out of the sunroof; (3) the strong odor of marijuana emanating from inside the Volvo when officers contacted him; and (4) Russell's belligerent and repetitive statements/behavior. While it behooves Russell to embrace willful blindness, these very factors are the reasons Officers French and Lentz suspected Russell was driving under the influence. What began as a traffic stop based on infractions blossomed into a criminal investigation into driving while impaired.[8] Any delay between the officers observing Russell's traffic infractions and the officers' actions related to the investigation into DUI was insignificant. Especially considering a mere six minutes passed between in person contact and arrest. An extended detention and questioning, if any, were supported by reasonable suspicion of criminal activity (DUI) beyond the initial traffic violation.

Russell implies the officers had different reasons for pulling him over other than those having to do with traffic violations. Under *Whren,* subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. 517 U.S. at 813. The Supreme Court affirmed this proposition in *Devenpeck:* "Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 125 S.Ct. at 593–94. As long as "the officers had probable cause to believe that [Russell] had violated the traffic code[,] ... the stop [was] reasonable under the Fourth Amendment." *See Whren,* 517 U.S. at 819. The fleet camera, the officers body worn cameras, the incident reports, and affidavits for search warrants make clear the officers were planning on conducting a vehicle stop due to Russell's ten minute stopping/standing/parking violation in the middle of a city street without displaying hazards and with no visible license permit. Since the officers could have relied on the traffic

---

[8] Russell repeatedly notes his possession of marijuana was legal (Dkt. 35 at 8). While Washington law permits the possession of marijuana under certain circumstances, federal law does not. *See* 21 U.S.C. §§ 823(f), 841(a)(1), 844(a). Under federal law, marijuana is a controlled substance, 21 U.S.C. § 812(c)(10), and is "contraband for *any* purpose." *Gonzales v. Raich***,** 545 U.S. 1, 27 (2005).

violation as a justification for stopping Russell, the stop was valid under *Whren.*

The fact the blood testing completed after the arrest remains pending toxicology results is simply not relevant in determining whether based on the totality of the circumstances on the evening of the arrest, a reasonable officer in Officers Lentz and French's position would have believed there was probable cause to arrest Russell.

Finally, Officers Lentz and French arrested Russell for suspicion of DUI. Though Officer French was aware of Russell's status as a convicted felon, the record shows he did not share that status with Officer Lentz until after Russell was arrested for DUI. Ex. C at 14:00-14:13. In fact, Officer Lentz informed Officer French of the presence of a pistol and Officer French's response is one of surprise, "Is there really? He's a felon." *Id.* Even then, Officer French elects to obtain a warrant to retrieve the firearm despite of the gun's presence in plain view.

Warrantless searches are "per se unreasonable." *Horton v. California*, 496 U.S. 128, 133– 34, n. 4, 110 S.Ct. 2301, 10 L.Ed.2d 112 (1990). The warrant requirement, however, is subject to certain exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "The plain-view doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable." *Horton*, 496 U.S. at 133.  For the plain-view doctrine to apply, officers must not violate the Fourth Amendment in arriving at the place from which evidence could be plainly viewed. *Horton*, 496 U.S. at 136. Essentially, this requires that "the officers 'have a lawful right of access to the object itself.' " *Collins v. Virginia*, 138 S. Ct. 1663, 1672, 584 U.S. 586, 201 L.Ed.2d 9 (2018) (quoting *Horton*, 496 U.S. at 136–37).

Here, Officers Lentz and French were within the confines of the Fourth Amendment when they pulled Russell over for multiple driving violations. During the course of the infraction stop, the officers' determined Russell was impaired by marijuana and placed him under arrest for suspicion of DUI. Prior to Russell exiting his Volvo for the second time, Officer Lentz observed a pistol in plain view while standing on Aurora Avenue outside of Russell's Volvo.  Russell, not the officers, reseated himself in the Volvo after the first request was made **for** him to exit the car. Russell, not the officers,

left the driver's side door open. *See Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) ("There is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (internal citations omitted). Though the officers could have seized the firearm at the scene, the elected to obtain a warrant. For these reasons, Russell's motion to suppress should be denied.

## C. There Was Probable Cause to Support the Search Warrants.

The crux of Russell's motion to suppress is that no warrants to search his car or draw his blood would have been issued if the Court knew his spin on the events leading up to his arrest. However, the affidavits clearly set forth probable cause wholly apart from the facts Officer French included with which Russell takes issue. Specifically, (1) the time frame of *one* hour versus *two* hours since Russell admitted to last consuming marijuana[9], or (2) whether screenshots from body worn camera footage support Russell's claims that his eyes were not watery, bloodshot, or droopy. It remains unclear how smoking marijuana two hours before getting behind the wheel is less problematic for Russell. Had Russell informed Officer French he consumed a bottle of wine two hours before driving, there would be little doubt as to the basis forming probable cause to investigate Russell for DUI. Officer French's mistaken inclusion of a one-hour time frame rather than a two hour time frame was not born of recklessness, but rather a simple mistake of little import.

Additionally, any supposed omissions in the affidavits concerning whether: (1) Russell showed the blunt and it had not been lit; (2) Russell drove twelve blocks without committing a traffic infraction (though he failed to pull to the right of the street and instead stopped in the middle of Aurora Avenue); or (3) that the temporary tag was

---

[9] Notably, Officer French did not include all of Russell's versions of his marijuana consumption in the affidavits for search warrants. Specifically, that Russell explained the last time he had marijuana was "a while maybe 2-3 hours ago" and that he did not have "any marijuana in a while" or that he claimed he "smoked a blunt earlier in the day." Ex. C at 7:42, 8:00).

posted in the rear window (though not plainly visible as required by law) do not even closely resemble material facts.

"Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference to a magistrate's determination." *See United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1069)). The Fourth Amendment permits a defendant to challenge the validity of a warrant only if the "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155 (1978). To justify a *Franks* hearing, Defendant must meet both the state of mind and materiality elements. *Id.* "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

"Probable cause means only a 'fair probability,' not certainty and requires consideration of the totality of the circumstances." *United States v. Garcia Villalba*, 585 F.3d 1223, 1233 (9th Cir. 2009). A police officer has probable cause to conduct a search when "the facts available…would 'warrant a [person] of reasonable caution in the belief'" that contraband or evidence of a crime is present. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). The test for probable cause is not reducible to "precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence…have no place in the [probable-cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). What is required is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Id.*, at 238. "In evaluating whether the government has met this practical and common-sensical standard, we have consistently looked to the totality

of the circumstances." *Florida v. Harris,* 568 U.S. 237, 243-44 (2013) citing *Gates*, 462 U.S. at 232; *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

A magistrate's determination of probable cause should be paid great deference by reviewing courts. *Gates*, 462 U.S. at 236. Reviewing courts should uphold a magistrate's determination of probable cause if, under a "totality-of-the-circumstances analysis," the issuing magistrate had a substantial basis for finding probable cause. *Id.* at 238-39. Thus, courts "give great deference to an issuing judge's finding that probable cause supports the warrant and review for clear error." *United States v. Flores*, 802 F. 3d 1028, 1043 (9th Cir. 2015), *cert denied*, 137 S. Ct. 36 (2016), *see also United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004). The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for…conclude[ing]' that probable cause existed." *Gates*, 462 U.S. at 238.

By the time Officer French arrested Russell and applied for search warrants for his car and his blood, he had either observed or learned the following: (1) from approximately 1:20 a.m. until 1:30 a.m. Russell stopped his running Volvo in the middle of a street without displaying hazard lights; (2) Russell quickly left when officers turned the patrol car around to contact him; (3) Russell had no license plate displayed and his tinted windows prevented the temporary license from being "plainly read at all times" pursuant to SMC Ch. 11.22.080; (4) Russell failed to pull over to the right and instead stopped in the left turn hand lane on Aurora Avenue, a busy thoroughfare; (5) Russell flicked an item outside of his sunroof before officers made contact; (6) the Volvo smelled strongly of marijuana when officers approached; (7) Russell's eyes were watery and bloodshot and his eyelids were droopy; (8) Russell admitted smoking marijuana earlier; (8) the Volvo had an open bag of marijuana and a blunt in the driver side door; (9) Officer Lentz observed a **Walther PPS 9mm semi-automatic pistol under the driver's seat in plain view**; (10) during a search incident to arrest a second apparent blunt was recovered from Russell's pocket; and (11) Russell is a convicted felon.  Ex. 36-1 at 2-3; Ex. A; Ex. B; Ex. C. Those facts, viewed collectively and "from the standpoint of an objectively reasonable police officer," *Maryland v. Pringle*, 540 U.S. 366, 371

(2003) (quotation marks omitted), were enough to show a fair probability that evidence of Russell's impaired driving and unlawful possession of a firearm would be found in the Volvo and through toxicology testing of Russell's blood.

Russell, however, frames each of these objective facts "in isolation, rather than as a factor in the totality of the circumstances." *Id.* at 372 n.2. The Supreme Court and this Court have consistently rejected that approach. *Id.*; *see also United States v. Malik*, 963 F.3d 1014 (9th Cir. July 6, 2020) (per curiam). This Court should reject it here, too.

**D. Russell is Not Entitled to a *Franks* Hearing.**

Russell's request for a *Franks* hearing should be denied because he has failed to make a substantial showing that Officer French intentionally or recklessly made false or misleading statements or omissions in support of the warrant. There has been no evidence to show that Officer French sought to mislead the court – rather, at worst, these alleged errors are simple mistakes or negligence. In addition, even assuming Russell could make such a showing he has failed to establish that any such statement or omission was material.

Under ordinary circumstances, the validity of a search warrant is judged based on the four corners of the affidavit. *United States v. Stanert,* 762 F.2d 775, 778 (9th Cir. 1985). A reviewing court may only look beyond the face of the affidavit when a defendant has made a substantial showing both that the affiant knowingly and intentionally made a false statement or made such a statement with reckless disregard for the truth, *and* that such a statement was material. *Franks v. Delaware*, 4338 U.S. 154, 155-56 (1978); *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214 (9th Cir. 2005).

In order to be entitled to a *Franks* hearing at all, the defendant must make a substantial preliminary showing of *both* falseness *and* materiality. *United States v. Norris*, 942 F.3d 902, 909-10 (9th Cir. 2019). That showing must be more than conclusory. As the Ninth Circuit has repeatedly affirmed, "bare assertions" do not entitle a movant to a *Franks* hearing. *See, e.g., United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002) (affirming denial of *Franks* hearing where defendant "offer[ed] no evidence…to support the claim that the omissions were reckless or intentionally

misleading," relying instead on "bare assertion"); *United States v. Collins*, 61 F3.d 1379, 1384 (9th Cir. 1995) (affirming denial of *Franks* hearing, holding defendant's "bare assertion that the omission…was deliberate 'because…agents knew the truth and failed to include it in the warrant application,' does not establish that the omission was the result of anything other than negligence or innocent mistake"). Rather to obtain a hearing, the defendant must provide detailed allegations of *deliberate* falsehood or *reckless* disregard for the truth, accompanied by an offer of proof. *Franks*, 438 U.S. at 171-72. The offer of proof should be made via affidavits or other reliable statements of witnesses, or their absence satisfactorily explained. *Id.*

With respect to falseness, the defendant bears the burden of showing by a preponderance of the evidence knowing and intentional or reckless conduct on the part of the affiant. *Id.* at 156. Recklessness is established in this context when there is a showing that the affiant has a "high degree of awareness of probable falsity" of the statement in his affidavit. *United States v. Senchenko,* 133 F.3d 1153, 1158 (9th Cir. 1998). "Allegations of negligence or innocent mistake are insufficient." *Franks*, 483 U.S. at 171. This rule that applies with equal force to "deliberate or reckless omissions of facts that tend to mislead." *Stanert*, 762 F.2d at 781.

As to the second prong, the defendant must show that the alleged falsities and/or omissions were material. That is, the defendant must "show that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *United States v. Fowlkes,*804 F.3d 954, 969 (9th Cir. 2015). On the other hand, if there remains sufficient information in the affidavit to support a finding of probable cause, the Court's inquiry is at an end. *Franks*, 483 U.S. at 171-78.

The reasons underlying the suppression remedy are to deter police officers who act in bad faith or who otherwise act improperly. *See generally Herring v. United States*, 555 U.S. 235, 141 (2009). That is not what happened here. Officers French and Lentz acted in good faith and made truthful statements to the court. They stopped Russell for traffic violations. When they smelled a strong odor of marijuana, the traffic stop turned into a DUI investigation. During the DUI investigation, Officer Lentz saw a gun under the

driver's seat in plain view. Russell was arrested for the DUI and the unlawful possession of a firearm. Officer French's mistaken inclusion of one hour versus two hours since Russell admitted to smoking marijuana does not detract from probable cause to believe Russell was driving impaired. Neither does referring to the blunt Russell reported was unlit as Officer French observed Russell toss an object out of the sunroof – presumably the marijuana Russell was smoking which resulted in the "strong odor" the officers both reported smelling inside the Volvo. Officer French's supposed omission relating to the temporary license not "plainly" visible at was not intentional or intended to mislead anyone. Finally, there is no valid evidence supporting Russell's claims that his eyes were not bloodshot, watery, or droopy that would warrant Officer French softening/modifying/omitting his description to accommodate Russell's revisionist history. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* Russell has failed to meet his burden.

**E. Even if the Warrant was Improper, the Good Faith Doctrine Applies.**

Even if this Court was to determine that the Court erred by issuing the warrants, no facts in the record suggest that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 923 n. 23. Where law enforcement "relie[s] on [a] warrant in an objectively reasonable manner," evidence found pursuant to the warrant is not suppressed under the exclusionary rule. *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007).

For this good faith exception to apply, the affidavit in support of the warrant "must establish at least a colorable argument for probable cause." *Id.* Where such a colorable argument for probable cause exists and a court ultimately finds that the affidavit did not establish probable cause, evidence found in good faith reliance on the warrant is safe from the exclusionary rule. *See United States v. Ramos*, 923 F.2d 1346, 1354-55 (9th Cir. 1991) *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001)

For the reasons explained above in detail, the affidavits in support of the search warrants, at the very, least provided a colorable argument for probable cause, and law enforcement relied on the warrant in good faith. The evidence collected under the warrant should not be suppressed.

**F. No Evidentiary Hearing Is Needed to Deny Russell's Motion.**

"An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." *Id.* at 621 (citation omitted). "[C]onclusory" or "boilerplate" motions do not meet this standard. *Id.* A defendant likewise has no right to an evidentiary hearing when his contentions are merely conjectural. *United States v. DiCesare*, 765 F.2d 890, 896 (9th Cir. 1985).

Here, the relevant events are captured on fleet camera and body camera video. Russell has identified no disputed issue of fact material to the suppression analysis. The Court can therefore deny his suppression hearing without an evidentiary hearing.

//

//

# VI.    CONCLUSION

The Defendant's motions to suppress and for a *Franks* hearing should be denied.

April 22nd, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

*s/ Cecelia Gregson*
CECEIA GREGSON
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

This filing contains 13,963 words, in compliance with the local rules as enlarged by the government's motion to file an overlength brief.