ATTACHMENT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

———————————————————————————————————————

UNITED STATES OF AMERICA,            )
                                     ) CASE NO. CR23-142-TL
                    Plaintiff,       )
                                     ) Seattle, Washington
v.                                   )
                                     ) October 30, 2024
KEITH LAMONTE RUSSELL,               ) 2:00 p.m.
                                     )
                    Defendant.       ) EVIDENTIARY HEARING
                                     )
                                     )

———————————————————————————————————————

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE TANA LIN
UNITED STATES DISTRICT JUDGE

———————————————————————————————————————

APPEARANCES:


  For the Plaintiff:        Cecelia Gregson
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        Christopher Carney
                            Carney Gillespie
                            600 1st Avenue
                            Seattle, WA 98104


  Reported by:              Nancy L. Bauer, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov

```
 1                        PROCEEDINGS
 2     _____

 3          THE CLERK:  Your Honor, the matter before the court is
 4     scheduled for a pretrial conference and motion hearing,
 5     Cause No. CR23-142, assigned to this court, United States of
 6     America versus Keith Lamonte Russell.
 7          Counsel, please make your appearances for the record.
 8          MS. GREGSON:  Good afternoon.  Cecelia Gregson for the
 9     government.
10          THE COURT:  Good afternoon.
11          MR. CARNEY:  Good afternoon, Your Honor.  Chris Carney
12     on behalf of Mr. Russell.
13          THE COURT:  Good afternoon.
14     Okay.  So I understand that we have a stipulated facts
15     bench trial set for November 13th in this case, should I deny
16     Mr. Russell's motion to suppress.  And just so the parties know,
17     I intend to issue a ruling on this motion by next Wednesday at
18     the latest.
19          As far as the evidentiary hearing, is the government
20     prepared to proceed?
21          MS. GREGSON:  I am.  I have two witnesses, Officer
22     Nicholas French and Officer Matt Lentz.  They're both out in the
23     hallway.  I'm going to walk through a couple of the portions of
24     body cam, respectively, and then the fleet cam with them, and
25     that will be the conclusion of the government's evidence.
```

1          THE COURT:  Okay.

2      You can proceed.

3      Is there anything else we need to address before we start

4  the hearing?

5          MS. GREGSON:  No.

6          THE COURT:  Okay.

7          MS. GREGSON:  Thank you.

8      The government calls Officer Nicholas French.

9                      NICHOLAS FRENCH,
           having been first duly sworn, testified as follows:

10

11                    DIRECT EXAMINATION

12  BY MS. GREGSON:

13  Q.    Good afternoon.

14  A.    Hello.

15  Q.    Can you please state and spell your name for the court

16  reporter?

17  A.    Nicholas French; N-i-c-h-o-l-a-s; F-r-e-n-c-h.

18  Q.    And what is your occupation?

19  A.    Seattle police officer.

20  Q.    And how long have you been employed with SPD as an officer?

21  A.    About five years.

22  Q.    Very briefly, can you describe the training that you

23  received in order to become an officer?

24  A.    Sure.

25      We do about two to three months of pre-academy training.

1    That's Seattle-specific training.  Then we go to a 720-hour

2    basic law enforcement academy, which is run by the State of

3    Washington.  After the academy, we do another two months,

4    approximately, of what we call post-academy training in Seattle.

5    And then there's various trainings throughout your time as an

6    officer to keep you current on state standings and trainings and

7    stuff like that.

8    Q.    And have you received training on both DUI investigations

9    for alcohol and narcotics as well as firearm investigations?

10   A.    I have.

11   Q.    Can you describe your -- I would call it a "beat" -- but

12   maybe your area of patrol or emphasis?

13   A.    At the time of the incident, I was a third-watch officer,

14   which is a night shift, in the North Precinct.  And at the time,

15   my beat was Nora2, which is, essentially, the Aurora corridor

16   from North 85th Street to North 145 Street.

17   Q.    And what were your duties?

18   A.    Mostly responding to 911 calls.  We also address community

19   complaints when they come into our precinct, and then address

20   any kind of activity we think might be dangerous, or traffic

21   infractions or, you know, things like that.

22   Q.    Okay.  And how many DUI investigations had you conducted in

23   July of 2023?

24   A.    About 75 as the primary officer, and then I've assisted on

25   many others; probably upwards of 100.

1   Q.   Okay.  How many of those were drug DUI versus alcohol?

2   A.   About 30 percent were drug DUI; the rest were alcohol.

3   Q.   Do you have a partner that you work with?

4   A.   Yes.

5   Q.   And who is that?

6   A.   Officer Lentz.

7   Q.   And were you two on duty on July 17 of 2023?

8   A.   Yes.

9   Q.   Were you working Nora2, as you called it?

10  A.   Yes.

11  Q.   All right.  Who was the driver and who was the passenger on

12  July 17th, 2023?

13  A.   Officer Lentz was the driver, and I was the passenger.

14  Q.   Are you familiar with the area of Highway 99 and North

15  137th Street, just east of Aurora Avenue?

16  A.   Yes.

17  Q.   What kind of activities are associated with this area of

18  the city?

19  A.   We get a lot of 911 calls about prostitution, drug crimes,

20  and violent crimes that involve firearms.

21  Q.   And what kind of activities with respect to illegal

22  activities do you typically see in that area between the hours

23  of, let's say, 12:00 a.m. to 3:00 a.m.?

24  A.   North 137 and Aurora, or Highway 99, especially, is known

25  for prostitution.  That intersection, for whatever reason,

1  there's usually, on any given night, 10 to 15 prostitutes

2  standing on that corner.

3  Q.   And are you familiar with the motel located off of Aurora

4  Avenue and North 137th Street?

5  A.   Yes.

6  Q.   What information, prior to July 17th, 2023, did you have

7  regarding the motel owners in that specific intersection?

8  A.   We have what's called "requests to watch" that are sent to

9  our precinct, and it's, sort of, an informal thing; just read it

10  at a roll call, saying, Hey, this business owner or community

11  member has asked that, you know, you pay attention to something

12  that's going on in the area.  In this case, the hotel owner was

13  concerned about cars that parked next to the driveway on 137th.

14  Q.   And in your training and experience, why would cars stop or

15  stand in the roadway on Aurora Avenue and 137th Street at, you

16  know, one o'clock in the morning or later?

17  A.   Usually to try to pick up a prostitute or just to watch

18  prostitutes, because -- for whatever reason, I guess.

19  Q.   All right.  Do you recall, generally, what kind of calls

20  you were responding to on the evening of July 17th, 2023?

21  A.   Mostly 911 calls, and we would do a couple of traffic stops

22  if it, you know, happens when we were not being dispatched to a

23  911 call.

24  Q.   All right.

25      Do you recognize Keith Russell in court from an incident on

1  July 17th, 2023?

2  A.   I do.

3  Q.   And can you identify him by something he's wearing, an

4  article of clothing?

5  A.   He's wearing a jacket that has a collar and some buttons on

6  the front, or maybe it's a shirt.

7        MS. GREGSON:  I'd ask the record to reflect that

8  Officer French has identified Mr. Russell.

9        THE COURT:  The record will so reflect.

10 Q.   (By Ms. Gregson)  Can you please describe where you first

11 encountered Mr. Russell?

12 A.   I was dispatched to a 911 call, so I was driving north on

13 Highway 99, Aurora Avenue North, and I saw a vehicle parked at

14 North 137th Street, by the hotel that we talked about earlier.

15 And after I was done with my 911 call, probably about 10 minutes

16 later, we were driving back south on Aurora Avenue North, and I

17 saw the same car parked there.  Since there was a community

18 complaint and it was stopped, blocking the roadway, Officer

19 Lentz and I -- Officer Lentz was driving, so he turned the car

20 around and drove to 137th Street, where we were going to conduct

21 a traffic stop on that car.

22 Q.   And do you know, approximately, what time you initially saw

23 Mr. Russell and, alternatively, what time you saw him again when

24 you were driving back?

25 A.   It was sometime between one o'clock and two o'clock, maybe

1    1:15, 1:20, and then the 911 call only took 10 minutes, so 10

2    minutes after that, 1:30.

3    Q.    Okay.

4          Is standing or stopping in the roadway a traffic infraction

5    under the Seattle Municipal Code?

6    A.    It is.

7    Q.    So you testified that when you drove back -- well, I guess,

8    technically, Officer Lentz drove back -- you guys turned around

9    so you could make contact.  What kind of car was the defendant

10   driving?

11   A.    It was a white sedan, a Volvo.

12   Q.    Okay.  And when you turned the patrol car around, please

13   describe what the Volvo did, what the driver did.

14   A.    The driver drove away from 137, going southbound on Aurora.

15   Q.    And going southbound.  Thank you.

16         At the time you turned the patrol car around to contact the

17   defendant, did you actually know who the car was registered to?

18   A.    I did not.

19   Q.    Could you see the gender of the person in the car?

20   A.    No.

21   Q.    Were you aware of the driver's ethnicity or any identifying

22   information about him?

23   A.    No.

24   Q.    Could you see any licensing on the car when you were

25   attempting to turn around to contact it?

1    A.    I did not.

2    Q.    Is a lack of a visible license plate or temporary tag a

3    traffic infraction under the Seattle Municipal Code?

4    A.    It is.

5    Q.    Have you had an opportunity to review the fleet-cam footage

6    in this case?

7    A.    Yes, I did.

8    Q.    For all fleet-cam footage and body-worn camera footage, is

9    it accurate that, while the video starts, the audio is delayed?

10   A.    Yes, it is.

11   Q.    How long before the audio kicks in?

12   A.    I believe it's a 60-second what they call a "buffer."  So

13   when you actually turn on your camera, it goes back 60 seconds

14   and captures video but not audio.

15   Q.    Got it.

16         In reviewing the fleet-cam footage, did you make any

17   assessment on how the defendant was able to get so far ahead of

18   you on 99 before you were able to pull him over?

19   A.    He must have been driving fast.

20   Q.    Okay.

21         MS. GREGSON:  I'd ask permission to play the fleet-cam

22   footage, which is Exhibit A under Docket 43.

23   Q.    (By Ms. Gregson)  While the sound is not working, can you

24   describe what we're looking at right here?

25   A.    Yeah.  That's the hotel we talked about, the Comfort Inn,

1    and this is 137th Street.

2    Q.    And that vehicle that we just saw --

3    A.    Yeah, I believe that was Mr. Russell's vehicle.

4    Q.    All right.  What are you and Officer Lentz doing right now?

5    A.    The car went south on Aurora, and so Officer Lentz has

6    turned the car around so that we can get back behind it and

7    initiate a traffic stop.

8    Q.    All right.  And can you estimate, at this point, how far

9    ahead the Volvo had gotten?

10   A.    It looks to me like it's a block and a half, but it's hard

11   for me to tell.

12   Q.    All right.  And what lane -- I'm going to ask you, so pay

13   attention to the video, please.

14        What lane is the Volvo in when you catch back up to it?

15   A.    It looks like the far-right lane.

16   Q.    Okay.  And when an officer activates lights and pulls a

17   driver over, what does the law require the driver to do?

18   A.    To pull to the right.

19   Q.    And did you notice whether or not Mr. Russell changed from

20   the right lane into the left lane as you approached?

21   A.    Yes.

22   Q.    Can you explain the options for places an individual could

23   have pulled over to the right, like the law requires?

24   A.    Yeah.  There's a big parking lot to the right.  There's,

25   you know, some fast food areas and stuff like that, and it has a

1  driveway that goes on and off Aurora.  Through the light, there

2  is another parking lot.  You can see the restaurant on the

3  right-hand side of the screen.  It's another parking lot to pull

4  into.

5  Q.    What is this cross street northbound 99?

6  A.    North 125th.

7  Q.    How would you describe that particular intersection?

8  A.    It's a busy intersection with a bus lane.  There's three

9  lanes of traffic on either side of the center turn lane.

10  Q.    And what safety concerns did you have with the driver

11  stopping in a turn lane in the middle of a highway?

12  A.    Well, the first would be other cars driving by at high

13  rates of speed, and there's not a lot of room for a person to

14  stand on the side at the window.

15        MS. GREGSON:  Your Honor, while I've been playing

16  this, the sound should have been coming through the speakers,

17  and it hasn't been.

18        THE COURT:  While we're taking this pause, can you

19  tell me what exhibit it is?  Do you know?

20        MS. GREGSON:  The exhibit for what we're viewing right

21  now?

22        THE COURT:  Yes.

23        MS. GREGSON:  It's Docket 43, which is a physical

24  exhibit to the government's response motion to the motion to

25  suppress and *Franks* motion, and it's Exhibit A in Docket 43.

```
 1          THE COURT:  And just for the record, these documents
 2    on the exhibit list, the parties have agreed will be admitted.
 3          MS. GREGSON:  Thank you.
 4      May I have my technical assistant come forward?
 5          THE COURT:  Yes.
 6          MS. GREGSON:  I'm going to have to back up the video.
 7    I apologize about that.
 8          THE COURT:  It would be helpful to me if I could know
 9    more specifically, like, if they know when the lights were
10    turned on and at what street.
11          MS. GREGSON:  Yes.
12          THE COURT:  And how far it was before he stopped.
13          MS. GREGSON:  Thank you.
14          THE COURT:  Thank you.
15          MS. GREGSON:  The system was muted.  May I inquire
16    again?
17          THE COURT:  Yes, you may.
18          MS. GREGSON:  I'm backing up to the 51-second mark, so
19    the audio should be just about on.
20    Q.   (By Ms. Gregson)  Where are you when you activated the
21    lights, approximately?
22    A.   It looks like 127th Street in Seattle.  The time of the
23    camera is exactly 60 seconds.
24    Q.   And while I'm asking, if that's 127th when you activated
25    the lights, how many blocks passed before Mr. Russell pulled --
```

1    I guess, stopped his car?

2    A.    It's just one block.  I think 127 goes to 125th.  There's

3    not, like, a street to turn off on 126th.

4    Q.    Thank you.  And we're going to hear some in-car audio.  I'd

5    like to ask you about that after we listen.

6                        (Video is played.)

7    Q.    And so we just heard you indicate that you can't see

8    whether or not he's moving around in the cab.  Can you indicate

9    why you had difficulty seeing inside the cab of the car?

10   A.    The windows are tinted.

11   Q.    Tinted?  And what did you see happen with his hand in the

12   sunroof?

13   A.    It looked like he stuck his hand out the sunroof to toss

14   something out.

15   Q.    Why are you concerned about a person moving around in a car

16   when you have effectuated a traffic stop?

17   A.    Well, based on my training and experience, I know people

18   that move around quickly in cars and start reaching for things

19   are either trying to hide something or reaching for something.

20   Q.    And you testified earlier you had an opportunity to review

21   the fleet-cam footage, and the body-worn footage, for that

22   matter.  Were you able to determine the hand sticking out of the

23   sunroof when you reviewed the footage?

24   A.    Can you repeat that, please?

25   Q.    Yeah.  It was ugly.  Sorry.

1     When you reviewed the fleet-cam footage, did you notice

2   when his hand came out of the sunroof?

3   A.    No, I didn't notice.

4   Q.    But you're heard on the in- -- I guess it's your body --

5   it's your in-camera car audio, saying you observed that.  What

6   do you attribute the lack of visibility with the fleet-cam dash?

7   A.    They're not quite the most technologically advanced

8   cameras.  I mean, there's other things on these cameras that you

9   can't see, like -- well, we'll get to later.  But you can see,

10  like, some of the things are blurred.  Like, even the 76 station

11  sign is, like, fairly blurry.  So to catch, like, fingers coming

12  out of a sunroof, you'd have to have a pretty good camera.

13  Q.    And while we're talking about things that are visible, do

14  you see any -- a temporary license plate affixed to the car, as

15  required by the Seattle Municipal Code?

16  A.    I do not.

17  Q.    Okay.  You testified earlier that Officer Lentz was

18  driving.  How do you determine who approaches what side of the

19  car?

20  A.    Well, it depends on where the car stops.  In this case,

21  since it's stopped, kind of, in the middle of the road, it makes

22  more sense for us to come up on either side of the car.

23  Q.    All right.  And so who is at the driver's side of the car?

24  A.    Officer Lentz.

25  Q.    And who is at the passenger side of the car?

1    A.    I am.

2    Q.    And when you initially make contact with Mr. Russell, as

3    we'll see in a moment, what is the first thing you observed or

4    noticed?

5    A.    Immediately smelled marijuana.

6    Q.    And as an officer on patrol, when you smell marijuana in a

7    car that you just pulled over for traffic violations, how does

8    that impact the trajectory of the stop?

9    A.    We're taught that that traffic stop now becomes a DUI

10   investigation from that point on.

11   Q.    Okay.  And do you recall what the law is with respect to

12   the amount of marijuana that's necessary to be in the blood in

13   order to be a crime?

14   A.    I believe it's five nanograms per milliliter of blood

15   within two hours of driving a motor vehicle.

16   Q.    And in addition to driving a motor vehicle, if a car is

17   running and you're impaired either by alcohol or marijuana, is

18   there a crime committed there?

19   A.    If the car is running and they're not driving?

20   Q.    Correct.

21   A.    Physical control of the vehicle.

22   Q.    All right.

23         Although personal consumption of marijuana has been

24   legalized in Washington State, to your knowledge was it

25   federally legal in July of 2023?

1    A.    To my knowledge, no.

2    Q.    All right.  I'm going to ask you more questions when it

3    comes to your body-worn camera, but I'd like to continue playing

4    this and ask questions as they come up.

5                        (Video is played.)

6    Q.    While we're looking at you and Officer Lentz doing the

7    original contact with the vehicle, can you explain why the two

8    of you don't move behind the vehicle once Mr. Russell exits?

9    A.    One thing we're taught about traffic stops in our academy

10   and post-academy trainings is you don't want to spend a lot of

11   time in the area between your patrol car and another vehicle,

12   especially when you're stopped in traffic like this, because if

13   another car rear-ends your patrol car, you, essentially, get

14   sandwiched in between the two vehicles.  So you just want to

15   limit your time there.

16   Q.    All right.

17         And as we will see, you depart from this contact with

18   Mr. Russell and leave Officer Lentz.

19         How do you determine who is responsible for running a

20   person's name or registration or any details when you make a

21   traffic stop like this?

22   A.    Usually the passenger.  We'll just get the information and

23   go back to the car and run it.  It's typical.

24   Q.    And is that what happened here?

25   A.    Yes.

1    Q.   What, specifically, are you running the driver's name for?

2    A.   We want to see if he is licensed.  We want to see if he has

3    any warrants for his arrest.  Criminal history is something that

4    comes up, typically, too.

5    Q.   While you're running the information about the driver in

6    this case, Mr. Russell, are you and Officer Lentz having any

7    communication?

8    A.   No.

9    Q.   So not via radio or anything else?

10   A.   No.

11   Q.   And what did you learn about Mr. Russell when you ran his

12   name through dispatch or through your information systems?

13   A.   That he was a convicted felon.

14   Q.   Did you share his status with Officer Lentz at that time?

15   A.   No.

16   Q.   Is it typical to share that?

17   A.   It depends.  Hindsight on it, I probably should have just

18   told him over the radio.  But it wouldn't be something where I

19   would walk back up and just broadcast to both of them.  That

20   seems like a weird thing to say to someone.

21   Q.   All right.  I'm going to press "play."

22                     (Video is played.)

23   Q.   While you're sitting in your patrol car, are you able to

24   hear any conversation between Officer Lentz and Mr. Russell?

25   A.   No.

1  Q.   How quickly does it usually take to get the data back that

2  you're seeking?

3  A.   Usually within 30 seconds, but it depends on the Internet

4  speed at the time.  It could be longer.

5  Q.   Scooting forward to the 5:17 mark, can you explain why you

6  walk up to the passenger window again?

7  A.   I want to be able to look into the car at a different angle

8  than my partner.

9  Q.   For what purpose?

10 A.   To see if I could see anything that would be pertinent to

11 my investigation.

12 Q.   Which, at that point, is an investigation into what?

13 A.   DUI.

14 Q.   What do you observe at the 5:55 mark?  What are you

15 observing at that time as the driver's door is open and you're

16 standing behind it and Mr. Russell is seated in the car with one

17 of his legs out?

18 A.   Right now I can see, with his door open, that there is a

19 marijuana package inside of the door frame cup holder, and I can

20 see him sitting inside of the car.

21 Q.   And is marijuana allowed to be open in a vehicle, under

22 state law?

23 A.   No.

24 Q.   Where is it to be kept?

25 A.   I believe the trunk.

1   Q.   Is it a traffic infraction to have an open container of

2   marijuana, just like it would be to have an open container of

3   beer or alcohol?

4   A.   It would be a secondary infraction.

5   Q.   At some point, did you notice that a white SUV drives by?

6   A.   I don't know if I noticed that in the moment here.

7   Q.   Okay.  Having reviewed the fleet-cam footage and preparing

8   for this hearing, did you observe a white car drive by and then

9   pull into the 76 gas station?

10  A.   Yes, I did.

11  Q.   Okay.

12                       (Video is played.)

13  Q.   As you're standing in the well of the car door, speaking

14  with Mr. Russell, what other observations are you making?

15  A.   Well, I can smell marijuana inside.  I could see it inside.

16  So after viewing the video and stuff like that, I started asking

17  him questions about his marijuana consumption.  And,

18  essentially, it's hard to conduct a DUI investigation while

19  someone is sitting in the car.  It's a good starting point, but

20  really what we're trying to do is take them out of the vehicle

21  so we can continue the investigation in a safer, better way.

22  Q.   All right.  And I'll ask you questions, in the body-worn

23  camera footage, in a moment about that.

24       How would you describe the marijuana smell?

25  A.   Like someone had just recently smoked it, so burned

1    marijuana.

2    Q.    All right.  And your report just says "marijuana."  Do you

3    recall that?

4    A.    Yes.

5    Q.    Is there a reason that you didn't elaborate?

6    A.    I guess it's not something I've done before.  I think when

7    I'm doing a DUI investigation and say "I smell marijuana," I

8    just thought it was obvious that it was burned marijuana.  But

9    going forward, it would be something I would specifically say,

10   that it smelled like burned marijuana.

11   Q.    All right.

12                        (Video is played.)

13   Q.    I'm going to fast-forward here a little bit.

14         Is there a point where you asked Mr. Russell to exit the

15   car?

16   A.    Yes.

17   Q.    And who shut the car door at that point?

18   A.    It looks like he did.

19   Q.    And do you see the white car at the 76 gas station?

20   A.    Yes, I do.

21   Q.    Does that car and that driver become a concern to you

22   during this interaction with Mr. Russell?

23   A.    They do.

24   Q.    And can you explain why?

25   A.    As the video progresses, you'll see that the driver of that

1    car gets out and walks all the way up to -- almost parallel with

2    our vehicle and the suspect's vehicle, on the sidewalk, and then

3    will eventually cross three lanes of traffic, coming towards

4    Mr. Russell's vehicle.

5    Q.    When that was happening, at the time were you aware that

6    there was a firearm in the car?

7    A.    I was not.

8    Q.    And moving forward a little bit, at what point do you

9    determine to arrest the defendant for DUI?

10   A.    Right now he's under arrest, and I'm telling him he's under

11   arrest.

12   Q.    And do you recall whether or not Mr. Russell was making

13   statements to the individual who was associated with that white

14   SUV?

15   A.    He was while we were placing him under arrest.

16   Q.    Do you recall what he was saying?

17   A.    He was saying things like -- something like, "They're

18   trying to search my car for DUI, I've got a license and

19   insurance," things like that.

20   Q.    Were you, in fact, trying to search the defendant's car for

21   DUI?

22   A.    Not at that time, no.

23   Q.    At about the 9:09 mark, do we see that civilian walking

24   towards the Volvo and your arrest of Mr. Russell?

25   A.    Yes.

1    Q.    What are we seeing here?

2    A.    I would say he's resisting arrest while yelling at this

3    person who has now walked across three lanes of traffic towards

4    the car, and that's Officer Lentz telling him not to go near the

5    car.

6    Q.    All right.  And is it your understanding now, having had

7    the benefit of this whole investigation, that Officer Lentz was

8    aware of the firearm underneath the seat?

9    A.    Yes.

10   Q.    Okay.  At the 10:15 mark of this video, do you recall

11   pulling something from the defendant's left pocket?

12   A.    Yes.

13   Q.    What was it?

14   A.    It looks like a marijuana cigarette, I guess, for lack of a

15   better word.

16   Q.    And what do you base that on?

17   A.    My training and experience.

18   Q.    What happened to it?

19   A.    I don't know.  I placed it on the hood of the car, and

20   while we were trying to get him in handcuffs or hold him down

21   while in handcuffs and he was yelling and we were trying to

22   secure the scene to make it safe, I'm not sure what happened to

23   it.

24   Q.    All right.  At the 13:30 mark, do you recall being informed

25   by Officer Lentz that there was a gun under the seat?

1  A.    Yes.

2  Q.    And at what point did you decide that you were going to get

3  a warrant for the car for the firearm?

4  A.    Well, specifically for the firearm?

5  Q.    Yes.

6  A.    Right when he told me.

7  Q.    And then is it accurate that other officers arrived for

8  backup assistance at 14:50 on this fleet-cam video?

9  A.    That sounds right.

10 Q.    All right.

11       I'd like to discuss your body-worn camera video, which is

12 Docket 43, I believe, Exhibit C.  Let me confirm that.

13 Exhibit B.  Excuse me.

14       And while the sound is lagging, did you prepare a report

15 that you documented and detailed the arrest of the defendant?

16 A.    I did.

17 Q.    And is there a copy of that, which is, technically,

18 Docket 36.1, at least a portion of it, in front of you?

19 A.    There is.

20 Q.    And did you also prepare two search warrant affidavits,

21 inventory returns, and judicial-approval receipts in connection

22 with this investigation?

23 A.    I did.

24 Q.    And all of that is contained in Docket 36.7.  Do you have

25 copies of, at least, the affidavits with you, currently?

1    A.    I do.

2    Q.    Great.

3          So is it fair to say, in addition to the fleet camera, you

4    were equipped with body-worn camera on July 17 of 2023?

5    A.    Yes, I was.

6                        (Video is played.)

7    Q.    And whose voice was that?

8    A.    That's my voice.

9    Q.    Okay.

10                       (Video is played.)

11   Q.    Does your body-worn camera have an accurate view of the

12   defendant's car or the defendant at that point?

13   A.    No.

14   Q.    All right.

15                       (Video is played.)

16   Q.    And why did you want him out of the vehicle?

17   A.    I could smell marijuana in the car, so I needed to conduct

18   a DUI investigation outside of the car.

19                       (Video is played.)

20   Q.    Did your body-worn camera capture the temporary license tag

21   in the back of the Volvo window?

22   A.    No.

23                       (Video is played.)

24   Q.    What did you notice about the defendant as you interacted

25   with him?  What were the physical indicators of DUI?

1  A.    His eyes were watery or glazed over.  They were red.  We

2  call it "bloodshot."  And his eyelids, when relaxed, were

3  droopy.

4  Q.    When you previously testified about the odor of marijuana

5  in the vehicle, the strong odor, what did you notice about the

6  defendant and his person while you were standing next to him

7  outside?

8  A.    His clothes also smelled like burned marijuana.

9  Q.    Why did you tell the defendant he could not go grab the

10  registration?

11  A.    Since I'm conducting a DUI investigation, I'm not going to

12  allow the person to get back into their car.  I still need to

13  continue my investigation outside of the car.

14  Q.    Was it your understanding, in that moment, that Officer

15  Lentz heard your instruction?

16  A.    I thought so.

17  Q.    Was the Volvo, in fact, running?

18  A.    I believe so.

19  Q.    So getting back into the car would have been in physical

20  control?

21  A.    Yes.

22  Q.    So we previously observed the fleet-cam footage when you go

23  back to the car.  I'm going to skip ahead a little bit to the

24  5:12 mark.

25                        (Video is played.)

1   Q.   What are you looking for when you're shining the flashlight

2   in the vehicle?

3   A.   Other evidence of DUI.

4   Q.   Such as?

5   A.   Marijuana or alcohol products.

6                    (Video is played.)

7   Q.   What did we just observe in the moments between 5:52 and

8   6:02 on the body-worn camera?

9   A.   I asked Officer Lentz if he sees any signs of a DUI, and he

10  says that he's not sure.

11  Q.   And how long have you been partnered with Officer Lentz?

12  A.   About two years.

13  Q.   Are there occasions where Officer Lentz tells you that he

14  has no concern of DUI?

15  A.   There has been.

16  Q.   In this instance, he said he wasn't sure?

17  A.   Right.

18  Q.   How did you interpret that?

19  A.   That the investigation needed to be continued.

20                    (Video is played.)

21  Q.   (By Ms. Gregson)  I stopped the frame at 6:10.

22       Going back through, with the benefit of hindsight, is there

23  anything significant about how the defendant angled his body in

24  this freeze frame?

25  A.   Yeah.  It looks likes he's positioned both legs to try and

1    screen or block something inside of the vehicle.

2    Q.   And was that the location where the firearm was recovered?

3    A.   Yes, it was.

4    Q.   And the location that you understand Officer Lentz observed

5    the firearm?

6    A.   Correct.

7                          (Video is played.)

8    Q.   In your experience, if a person has smoked marijuana, do

9    you find remnants of marijuana that's been smoked or consumed in

10   the car after the fact?

11   A.   Usually people get rid of it.

12   Q.   How so?

13   A.   Throw it out a window.

14   Q.   We just heard Officer Lentz instruct the defendant to get

15   out of the car.  Were you, at that point, aware that Officer

16   Lentz had observed the firearm?

17   A.   No.

18                          (Video is played.)

19   Q.   Who shut the door when the defendant exited the car for the

20   second time?

21   A.   The defendant did.

22   Q.   And is that significant to you?

23   A.   Yes.

24   Q.   Why?

25   A.   I think he was trying to block our view into the vehicle.

1    Q.    Was he actually physically leaning against the vehicle?

2    A.    Yes, he was.

3    Q.    Had you known there was a firearm in the car, since you

4    knew he was a felon, would that have altered your conduct in

5    this instance?

6    A.    Yes.  He'd be in handcuffs right now.

7                            (Video is played.)

8    Q.    Would a breath sample help you in the case of a marijuana

9    DUI?

10   A.    No.

11   Q.    What about field sobriety tests?

12   A.    They might.

13   Q.    In a normal investigation, would you have proceeded with

14   that either off on the side of the road or at the precinct?

15   A.    Yes.

16                           (Video is played.)

17   Q.    So you had answers for how much marijuana he smoked in the

18   time frame.  Was that significant to you, from an investigative

19   standpoint?

20   A.    Yes.

21   Q.    Why?

22   A.    I think if he knew exactly when he had smoked, he would be

23   able to tell me, or if he hadn't smoked at all, he'd be able to

24   tell me, but the fact he was changing the answer meant he was

25   probably lying to me.

1    Q.    And why is it significant when you're investigating for DUI

2    if a person has red, bloodshot, or droopy eyes?

3    A.    We're trained that those are signs of impairment from

4    marijuana.

5    Q.    And why is it significant in a DUI investigation if a

6    person has open containers of unused marijuana?

7    A.    It's a clue that, one, there's been marijuana that has been

8    used, because a container that's opened is typically opened to

9    consume what's inside of it.

10   Q.    Was it also consistent with the odor in the car and on the

11   defendant's person?

12   A.    Can you ask me that again?

13   Q.    Yes.

14         Was the open container, and your testimony about it being

15   an indicator that someone used marijuana, consistent or

16   corroborative of the smell that you had when you approached the

17   car and then later when you were with the defendant outside of

18   the car?

19   A.    Yes, it was.

20   Q.    Why?

21   A.    Well, based on my training and experience, I know that

22   marijuana that smells like that on a person and in the car, and

23   since it was inside of the car, those are clues altogether that

24   there was impairment and use of marijuana.

25                         (Video is played.)

1   Q.   What did you just say to Officer Lentz at that mark just

2   before 8:45?

3   A.   "450 Adam."

4   Q.   What does that mean?

5   A.   It means this person is under arrest for DUI.

6                       (Video is played.)

7   Q.   At that point you've placed the defendant under arrest.

8   How would you describe his behavior during the investigation,

9   prior to arrest?

10  A.   Very nervous, agitated, almost angry.

11  Q.   How many times did he tell you that he had license and

12  insurance, despite the questions being asked?

13  A.   More than 15 times.

14  Q.   After arresting the defendant for DUI and unlawful

15  possession of firearm, where did you take him?

16  A.   The Seattle Police North Precinct.

17  Q.   What are you expected to do to obtain a DUI search warrant?

18  A.   I do, kind of, a meat-and-potatoes probable cause

19  certificate or affidavit for a warrant, call the judge and wake

20  them up, and send them the warrant for blood, and in this case

21  the car, which they returned, and then I go to the hospital and

22  get blood.

23  Q.   All right.  And when you say "meat and potatoes," can you

24  be more descriptive about what you mean by that?

25  A.   Yeah.  Sorry.

1          Basically, I'm taught, when writing a warrant, especially

2     at two o'clock in the morning when you have to call a judge and

3     wake them up, you just want the more concise, basic version of

4     what your report is going to be later.  So it's literally just

5     your probable cause, so your reason for contacting this person

6     and your specific reasons for thinking they're impaired.

7     Q.    Does it include every fact you know, or just the most

8     pertinent facts in your opinion?

9     A.    No, not every fact.

10    Q.    All right.  Have you had an opportunity to review the two

11    affidavits that you wrote for the firearm search of the car, as

12    well as the blood search?

13    A.    Yes.

14    Q.    And those are both contained in Docket 36.7.  The first is

15    page 5, and the second is page 14.  The firearm possession is

16    page 5.

17          In your review of these two affidavits, are their nearly

18    identical?

19    A.    Nearly.

20    Q.    And what is the one difference on the unlawful possession

21    of a firearm search warrant?

22    A.    I add where the vehicle is going.

23    Q.    And that is where?

24    A.    To the North Precinct and then the Lincoln tow lot.

25    Q.    Prior to writing the warrant, did you review any fleet- or

1    body-worn camera footage?

2    A.    No.

3    Q.    In the affidavit for both unlawful possession of a firearm

4    and DUI, you indicate that Mr. Russell admitted to smoking

5    marijuana one hour prior to driving, instead of two hours or

6    earlier or a blunt or two to three hours.  Was that an

7    intentional misstatement of the facts?

8    A.    No.

9    Q.    Can you explain why you wrote, in that moment, "one hour

10   prior to driving"?

11   A.    Like you said, he made several other, you know, statements

12   about when and what he had smoked.  He said "two hours," "a

13   while," "one blunt," and when writing the affidavit, I just made

14   a mistake and wrote "one hour."

15   Q.    If you had written "two hours prior to driving," "a while,"

16   "earlier in the day," or "one blunt" was smoked, as admitted to

17   by Mr. Russell, do you believe that would have altered the

18   probable cause findings?

19   A.    No, not at all.

20   Q.    Was this simply an error?

21   A.    It was an error.

22   Q.    After you obtained the blood at the hospital, what was the

23   next thing that you did with respect to this investigation?

24   A.    Went back to the precinct and put the blood into our

25   evidence refrigerator.

1    Q.    Okay.  And did you have an occasion to write the incident

2    reports, which are contained in Docket 36.1?

3    A.    I did.

4    Q.    And did you do that before or after the affidavits?

5    A.    After.

6    Q.    And your incident report has additional facts not contained

7    in the affidavit.  Why is that the case?

8    A.    Well, we had more time to sit down and kind of process all

9    the information that we had and put it all into a longer report.

10   Q.    Did you include any facts about your observation, and

11   belief that the defendant had been smoking marijuana in the car

12   and flicked something out of the sunroof, into your affidavits?

13   A.    No.

14   Q.    Why?  Why not?  Why not include those facts?

15   A.    Well, I thought I had enough probable cause, based on the

16   other things I put in there, to submit the warrant and I didn't

17   need all the extra details.

18          MS. GREGSON:  I don't have any further questions for

19   this witness.

20                          CROSS-EXAMINATION

21   BY MR. CARNEY:

22   Q.    Good afternoon, Officer French.  How are you?

23   A.    I'm doing good.  Thanks.

24   Q.    Great.  So I just want to talk to you for a minute about

25   seeing the white Volvo on North 137th.  You indicated that you

1    saw it there.  Was it in the same position as when the fleet

2    camera showed it?

3    A.    I don't remember exactly when the fleet camera showed it,

4    but about -- about the same.

5    Q.    Okay.  Let me see if I can help you out.

6    A.    Okay.

7    Q.    I'm going to show you Exhibit 49-1.  That's a still shot

8    from the fleet camera showing where the Volvo was located as you

9    and Officer Lentz pulled towards it.

10        Was that where you saw it the first time?

11   A.    To my memory, it was a little further back, like, closer to

12   the driveway.  This looks closer to the stop sign.

13   Q.    So in summary, would you say it's accurate that you saw it

14   in one position, and then several minutes later you saw it in

15   slightly a different position?

16   A.    Now, when you say "the first time," you mean when I was

17   going to my initial 911 call around 01:20?

18   Q.    Correct.

19   A.    And then the second time being when we passed it coming

20   back from the 911 going south?

21   Q.    Correct, being this time that's shown in 49-1.

22   A.    So in my head, this is, technically, the third time,

23   because we went south on Aurora and then flipped back going

24   north, which is the way we're facing in this still.  So on the

25   third time, I would say it was different than the first and

1    second time we saw it.

2    Q.    Okay.  And in between, you don't know where it was?

3    A.    The first and second time?

4    Q.    Correct.

5    A.    Yeah.  I don't know.

6    Q.    Okay.

7          So 10 minutes apart, you saw it in roughly the same but not

8    the same location?

9    A.    That's accurate.

10   Q.    Whether it might have pulled into the parking lot, turned

11   around, driving away, done anything in between, you couldn't

12   say?

13   A.    Yeah.  In between the first time I saw it going to a call

14   and then coming back from that call, the second time, I couldn't

15   tell you what occurred.

16   Q.    And you'd agree with me there's nobody behind this car,

17   right?

18   A.    It doesn't look like it in this picture.

19   Q.    So no one is being obstructed, or prevented from turning or

20   driving North 137th, by this vehicle?

21   A.    Not in this still shot.

22   Q.    At the time that you pulled up and this still shot is

23   taken, the lights on the car were not on -- right? -- your car,

24   your overhead lights?

25   A.    No.

1    Q.    So was Mr. Russell under any obligation to do anything for

2    you at that moment?

3    A.    Nope.

4    Q.    In fact, he was perfectly free to do what he did, which was

5    legally turn left onto Aurora, into a lane of traffic, and begin

6    driving away, correct?

7    A.    Correct.

8    Q.    And, in fact, that's what he did?

9    A.    Correct.

10   Q.    And you didn't observe his driving during the few seconds

11   it took you to turn around, right?

12   A.    No.

13   Q.    And he was a block or two ahead of you, at that point, by

14   the time you turned back around?

15   A.    That's right.

16   Q.    Okay.  Then we watched the fleet camera.  Was there

17   anything unlawful about the way Mr. Russell was driving on the

18   fleet camera?

19   A.    Maybe the speed, but it would be too hard for me to say,

20   based on the video.

21   Q.    So you couldn't say there was probable cause to believe he

22   was speeding?

23   A.    No.

24   Q.    He wasn't swerving across lane dividers?

25   A.    Not that I noticed.

1    Q.    He wasn't suddenly accelerating or braking?

2    A.    No, I'd say the sudden acceleration from the stop sign, but

3    not in a lane of travel.

4    Q.    When you got behind him, Ms. Gregson asked you whether he

5    changed lanes to the left, right?

6    A.    Right.

7    Q.    He did so in a way that was legal, correct?

8    A.    Correct.

9    Q.    He signaled first, and then he made a change to the left

10   when it was safe for him to do so.

11   A.    Correct.

12   Q.    And wouldn't you agree that, at the moment that he did

13   that, you had been accelerating toward him to catch up?

14   A.    Correct.

15   Q.    So it would have been a relatively typical thing for a

16   person to do to get over and get out of your way, right?

17   A.    I don't think it would be normal.  I mean, I -- I don't

18   know.

19   Q.    You don't think it would be normal for a person to get out

20   of way of a police officer accelerating up behind him with his

21   lights off?

22   A.    I don't know how you'd know I was a police officer with my

23   lights off.

24   Q.    You were in a marked patrol vehicle, yes?

25   A.    I guess I don't typically have people move out of the way

1    to the left when I'm behind them without my lights on.

2    Q.    Okay.  Prior to the moment that you turned your lights on,

3    had you observed anything about Mr. Russell's driving that you'd

4    like to bring to our attention as evidence that he was impaired?

5    A.    No.

6    Q.    When Officer Lentz turned on the patrol car's lights to

7    stop Mr. Russell, you were between intersections at that time,

8    right?

9    A.    Correct.

10   Q.    And you mentioned earlier that there either is no 126th

11   Street or, if there is, there is no light at an intersection for

12   it.

13   A.    Correct.

14   Q.    So he didn't pass through any intersections after you

15   turned on lights, right?

16   A.    Right.

17   Q.    In fact, within less than a block, he slowed down, turned

18   on his left turn signal, and got into the next available left

19   turn lane at a light, correct?

20   A.    Correct.

21   Q.    And when he stopped at that light, did he go over the line

22   into the intersection?

23   A.    I don't think so.

24   Q.    Was his left turn signal on?

25   A.    I believe so.

1  Q.    Was the light red?

2  A.    Yes.

3  Q.    So at that moment what would you have had him do, go

4  through the red light?

5  A.    Well, he could have gone straight through the green light.

6  I believe he made the decision to turn left into the turn lane

7  after we had initiated our stop with our lights.

8  Q.    He was already in the left lane, though, right?

9  A.    Yes.

10 Q.    And there were vehicles going down the right lane past him

11 as you turned on your lights, yes?

12 A.    Yes, I believe so.

13 Q.    A motorcycle, a semi truck, several passenger vehicles?

14 A.    Sounds right.

15 Q.    Okay.  So in order to get over to the right, he would have

16 had to negotiate two lanes of traffic to do so safely, correct?

17 A.    Correct.

18 Q.    And on that stretch of Aurora, there's no right-hand

19 shoulder for him to pull onto.  He would have had to pull into a

20 parking lot somewhere as well, correct?

21 A.    Correct.

22 Q.    So, instead, he chose to signal, get into the left lane,

23 wait for the light, and go to the left, right?

24 A.    Right.

25 Q.    Okay.  At that moment, when he was waiting for the light,

1    was when Officer Lentz chirped his siren, correct?

2    A.    That sounds right.

3    Q.    Okay.  And it was at that moment, when he chirped the

4    siren, that Mr. Russell put his hands out the window of the car,

5    correct?

6    A.    Right.

7    Q.    To you, does that indicate impairment?

8    A.    Not that alone.

9    Q.    Okay.

10        Now, you said that you saw something being flicked out of

11   the sunroof of the car.

12   A.    Correct.

13   Q.    You've agreed, however, that on the fleet camera, that

14   doesn't show.

15   A.    Right.

16   Q.    And you didn't find anything that was flicked out of the

17   car.

18   A.    No.

19   Q.    And you didn't say, on your body-worn camera, "I saw him

20   flick something out of the sunroof."

21   A.    No.

22   Q.    You said you "saw a hand."

23   A.    Right.

24   Q.    You're aware, Officer French, that you're being recorded

25   when you're doing investigations, right?

1   A.   Yes, I am.

2   Q.   Okay.  So it's not as though these are just your musings,

3   never thinking no one is ever going to see them or hear them;

4   you know it's being recorded, right?

5   A.   Right.

6   Q.   So if something of evidentiary significance occurs, you may

7   mention that on the microphone, right?

8   A.   I guess I don't think about my camera like that.

9   Q.   Okay.

10       You mentioned that you did not see a license plate on Mr.

11  Russell's car, correct?

12  A.   Correct.

13  Q.   I'm going to show you a segment of what's been marked as

14  36-6, which is Officer Lentz's body camera.  I'm going to move

15  forward to 2:36, if I can get there.

16           MS. GREGSON:  I do object to questions of Officer

17  French about the body-worn camera that Officer Lentz was

18  wearing, because he's not Officer Lentz and he didn't have that

19  viewpoint.

20           THE COURT:  I think it depends on, sort of, what he's

21  going to show, because it points -- he is there, so I'll wait to

22  hear what the question is.

23           MR. CARNEY:  For the record, I intend to ask things of

24  Officer French relating to things that he did that are shown on

25  the camera.

1  Q.    (By Mr. Carney)  So, here, you're speaking to Mr. Russell.

2  I believe this, actually, also showed up on the fleet camera.

3  You asked him about the license plate.  He tells you that he

4  just bought the car, and then he taps the back window.  Do you

5  remember seeing that?

6  A.    Yes.

7  Q.    Okay.  I'm going to show you a picture of the vehicle.  Is

8  it common practice for a vehicle to be photographed in the

9  process of a search warrant?

10  A.    Yes.

11          THE COURT:  Just for the record, this is Exhibit

12  36-3 and --

13  Q.    (By Mr. Carney)  And this is a photo of Mr. Russell's Volvo

14  taken by one of your colleagues at the North Precinct on the day

15  of his arrest, correct?

16  A.    I believe so.

17  Q.    That's a temporary tag right where he tapped the window,

18  isn't it?

19  A.    You could see it.

20  Q.    Right.

21          So he tapped the window right where that temporary tag was.

22  A.    Yes.

23  Q.    And, in fact, there was a temporary tag.

24  A.    Yes.

25  Q.    And the vehicle was lawfully registered to him.

1    A.    Yes, it was.

2    Q.    When Mr. Russell was asked to get out of car the first

3    time, he did so, correct?

4    A.    Yes.

5    Q.    You asked for his driver's license.  He presented it to

6    you.

7    A.    Correct.

8    Q.    Didn't have any trouble finding it?

9    A.    Right.

10   Q.    Didn't hand you a Sam's Club card by accident or anything,

11   right?

12   A.    Nope.

13   Q.    Valid license?

14   A.    Valid license, from my memory.

15   Q.    You ran his name.  No warrants.

16   A.    No warrants.

17   Q.    He explained that he had intended to pull over to the left

18   into the adjacent parking lot, correct?

19   A.    Correct.

20   Q.    When he tapped on the back window, did you look at what he

21   was tapping at?

22   A.    Yeah.

23   Q.    And you didn't see this tag?

24   A.    At that point, I know that there was a tag when he points

25   it out.

1    Q.    Okay.  So now you know that he's got a temporary license

2    tag.

3    A.    Right.

4    Q.    And that the car is validly registered to him.

5    A.    Correct.

6    Q.    Okay.

7          I'm going to show you a different exhibit.  This one is

8    36-8.

9          These are Mr. Russell's eyes at the moment that you

10   approached the vehicle, correct?

11   A.    I believe so.

12   Q.    Can you point out the redness?

13   A.    Not in this photo.

14   Q.    Can you point out the drooping eyelids?

15   A.    Not in this photo.

16   Q.    If we were to watch the entire fleet camera, would you be

17   able to tell me exactly when his eyelids were drooping?

18   A.    If we watched all of the video, I could probably do it.

19   Q.    Okay.  Why don't you tell me what minute to go to.

20   A.    I couldn't do that.  I'd have to watch the video and pick a

21   minute.

22   Q.    Okay.

23         Did you watch that video and both your body-worn camera and

24   that of Officer Lentz prior to this hearing?

25   A.    I did.

1    Q.    Did you discuss it with Ms. Gregson?

2    A.    I did.

3    Q.    And did you discuss particular times at which items of

4    evidentiary significance occurred?

5    A.    I think we spoke about some times, yeah.

6    Q.    Did you write down in your notes, anywhere on the camera,

7    where his eyes drooped?

8    A.    No.  I didn't write notes.

9    Q.    And in your testimony, you didn't point out anywhere on the

10   camera when his eyelids drooped?

11   A.    Nope.

12   Q.    Could've, though, right?

13   A.    Could've.

14   Q.    If it was there.

15   A.    If the camera caught it properly.

16   Q.    Uh-huh.

17         You mentioned that you'd been trained to investigate DUI,

18   but you are not a drug recognition expert, correct?

19   A.    No, I'm not.

20   Q.    Explain the difference, please.

21   A.    A drug recognition expert has to go through other training

22   to identify specific signs of impairment related to narcotics,

23   not just alcohol.  A typical patrol officer goes through basic

24   DUI training that focuses on alcohol and marijuana and other

25   narcotics, but it's not as extensive as a drug recognition

1    expert.

2    Q.    So you don't have that training?

3    A.    No.

4    Q.    Neither does Officer Lentz?

5    A.    No.

6    Q.    He has the same training you do, though, right?

7    A.    He does.

8    Q.    And so when you came back to the car after going to run

9    Mr. Russell's name, you wanted to know what his assessment was

10   of Mr. Russell's possible level of intoxication, right?

11   A.    I did ask him.

12   Q.    Because he is a trained police officer who knows how to

13   look for impairment, just like you do.

14   A.    Correct.

15   Q.    And what he said was, "I don't know.  I can't tell."

16   A.    Correct.

17   Q.    That's not probable cause, is it?

18   A.    Well, just because he didn't see signs of impairment

19   doesn't mean that I didn't.

20   Q.    Why'd you ask if you already knew?

21   A.    Why wouldn't I ask him?  He's my partner.  Maybe he saw

22   something else.

23   Q.    Okay.

24        In any event, after he had more opportunity to interact

25   with Mr. Russell than you had, his response was, "I don't know,

1    I can't tell."

2    A.    I think he said "I'm not sure."

3    Q.    What he didn't say is, "Yeah, I think he's impaired."

4    A.    Correct.

5    Q.    Okay.

6         I'm going to show you what's been marked as Exhibit 36-9,

7    which is your body-worn camera, and I'm going to skip ahead.

8    I'm going to start at 2:41.

9                         (Video is played.)

10   Q.    (By Mr. Carney)  Okay.  What is going on in the background

11   there?  What is Officer Lentz doing?

12   A.    Looking into the car.

13   Q.    Not just looking into the car, though, right?  He actually

14   put his hands and head inside the vehicle, correct?

15   A.    I can't tell from this angle.

16   Q.    Let's watch it again.

17                         (Video is played.)

18   Q.    Now were you able to see Officer Lentz put his hand inside

19   the vehicle through the window?

20   A.    I can't tell how far he extends it into the car or if he

21   does at all.

22   Q.    Okay.  I'll ask him.

23        Did anybody ask Mr. Russell whether it would be okay for

24   Officer Lentz to put his hands inside the vehicle?

25   A.    I didn't ask him.

1  Q.    Did you hear Officer Lentz ask him that question?

2  A.    I did not.

3  Q.    You were standing there, right?

4  A.    Yes, I was.

5  Q.    You were talking to him at the time.  Officer Lentz wasn't

6  talking to him.

7  A.    Correct.

8  Q.    So fair to say nobody asked him, right?

9  A.    That's fair.

10 Q.    Okay.

11       I'm going to take you to Exhibit 36-6, and we're going to

12 start at 3:47.

13                         (Video is played.)

14 Q.    (By Mr. Carney)  So this is Mr. Russell getting back into

15 the car, right?  And you weren't here when this happened.

16 A.    Right.

17 Q.    You were in the patrol car running his name?

18 A.    Right.

19 Q.    Are you aware of any conversation that happened between

20 Mr. Russell and Officer Lentz before he got back into the car?

21 A.    No.

22 Q.    Have you since then learned about that?

23 A.    After watching the cameras, yeah.

24 Q.    Okay.  So would you agree with me that Officer Lentz

25 instructed Mr. Russell to get back into the car and get the

1    license and registration and proof of insurance?

2    A.    Yes.

3    Q.    Okay.

4          All right.  I'm going to move forward to about the

5    six-minute mark.  Now let's watch this.

6                        (Video is played.)

7    Q.    (By Mr. Carney)  That's you returning to the patrol car to

8    reengage with Mr. Russell and Officer Lentz, correct?

9    A.    Correct.

10   Q.    At that point, the door is partly open.

11   A.    Correct.

12   Q.    The first thing you did was put your left hand on the

13   inside of the door and push it farther open; isn't that right?

14   A.    Correct.

15   Q.    Did you ask Mr. Russell if you had permission to do that?

16   A.    No.

17   Q.    Did he offer permission for you to do that?

18   A.    No.

19   Q.    You didn't give him a choice.

20   A.    No.

21   Q.    And that's when you saw marijuana in the map pocket,

22   correct?

23   A.    No.

24   Q.    You'd seen it before you pushed the door open?

25   A.    Yes.

1    Q.    Okay.  Did you see anything else after you pushed the door

2    open?

3    A.    No.

4    Q.    Do you know whether Officer Lentz saw anything more after

5    you pushed the door open?

6    A.    Having now watched the video, I know that he surely sees a

7    firearm in the car.

8    Q.    But prior to that, he had not.

9    A.    I don't believe so.

10   Q.    You mentioned finding something in Mr. Russell's pocket.

11   I'm going to show you what's been marked previously as 49-2 and

12   ask you if you can identify this.

13   A.    Did you ask me a question about this?

14   Q.    Yeah.  Can you identify it?  What is it we're looking at

15   here?

16   A.    This is an evidence photo.

17   Q.    And when you say "evidence photo," this is what was

18   eventually recovered after both search warrants were served,

19   right?

20   A.    Correct.

21   Q.    The car had been thoroughly searched at this point.

22   A.    Correct.

23   Q.    Okay.

24        You testified that you took what looked like a blunt out of

25   Mr. Russell's pocket when you arrested him, right?

1    A.    Yeah.  I think I described it as a "marijuana cigarette,"

2    but, yeah.

3    Q.    Okay.  You didn't record that in your report, right?

4    A.    Correct.

5    Q.    Didn't say anything about it?

6    A.    Right.

7    Q.    And whatever it was, apparently, you lost it?

8    A.    Correct.

9    Q.    So this is a DUI investigation, correct?

10   A.    Right.

11   Q.    A partially smoked marijuana cigarette would have been

12   highly relevant, right?

13   A.    Right.

14   Q.    It should have been in this picture.

15   A.    I should have collected it.

16   Q.    Okay.  Whatever that was you found, you don't have it.

17   A.    That's correct.

18   Q.    Never saw it again.

19   A.    Nope.

20   Q.    Not in this picture.

21   A.    Not in the picture.

22   Q.    Okay.

23         You asked Mr. Russell whether you could search his car,

24   right?

25   A.    Right.

1   Q.   He had the right to say no.

2   A.   He did.

3   Q.   And, in fact, he did say no.

4   A.   Yes.

5   Q.   And so when you asked him to step over to the sidewalk, and

6   he said, "I'm going to lock my car because I don't consent to a

7   search," you could have simply said, "Sir, we will not search

8   your car without consent or a warrant," right?

9   A.   Could have said that.

10  Q.   In fact, that's the legal requirement for you to search the

11  car in that moment, isn't it?

12  A.   Consent or a warrant?

13  Q.   Correct.

14  A.   Correct.

15  Q.   So instead of telling him, "Sir, we will not search your

16  car," you just immediately placed him under arrest.

17  A.   "Immediately" is kind of a loose term.  I don't know how

18  long passed after he said that and I placed him under arrest,

19  but shortly after.

20  Q.   A few seconds?

21  A.   Sure.

22  Q.   He had said that he would do whatever you asked, a field

23  sobriety test or a breath test, which you had asked for,

24  correct?

25  A.   Correct.  That's why I asked him to move to the sidewalk.

1   Q.    Right.  And when he said, "I'm going to lock my car first,"

2   you wouldn't allow him to do that.

3   A.    I don't know if he tried or if I would have stopped him if

4   he did, I guess, so...

5   Q.    He told you he would do field sobriety tests, correct?

6   A.    Correct.

7   Q.    The only condition he put on that was that you were not

8   allowed to search his vehicle, right?

9   A.    I don't remember if that's what he said.

10  Q.    Well, you had asked, and he said no, and then when you

11  asked him to go to the sidewalk, he said, "I'm going to lock my

12  car first," right?

13  A.    Right.

14  Q.    If you didn't want him to lock the car, you could have just

15  told him you weren't going to search it.

16  A.    I could have.

17  Q.    But you didn't.

18  A.    No.

19  Q.    Now, regarding what you put in the search warrant, you said

20  that he admitted to having smoked marijuana within one hour of

21  driving.

22  A.    Right.

23  Q.    You didn't say, "I think he said that."

24  A.    Correct.

25  Q.    You didn't say, "I'm not sure what he said."

1    A.    Right.

2    Q.    You said he admitted to smoking marijuana within one hour

3    of driving.

4    A.    Correct.

5    Q.    At no point did he say that, right?

6    A.    No, he didn't say "one hour."

7    Q.    In fact, what he said was, "two or three hours, and I am

8    not affected by it," right?

9    A.    He did say "within two or three hours."

10   Q.    And he also said he wasn't affected by it, right?  You

11   asked him that, right?

12   A.    I don't think I asked him that, specifically.  I think I

13   asked if he typically feels impaired when smoking marijuana.

14   Q.    And his response was, "Not after two or three hours."

15   A.    Correct.

16   Q.    So wouldn't you agree that it's fair to characterize his

17   statement as denying feeling the effects of marijuana at that

18   point?

19   A.    He did deny it.

20   Q.    Yeah.  You didn't put that in the warrant?

21   A.    No.

22   Q.    You didn't put in that he denied having smoked within two

23   or three hours?  You did not put in the warrant that he denied

24   experiencing the effects of marijuana at the time of driving?

25   A.    No.

1    Q.    You were aware of those facts, right?

2    A.    I was.

3    Q.    You were literally standing right in front of him when he

4    said, "Not in the last two or three hours," right?

5    A.    I was.

6    Q.    Okay.  How do you explain coming up with something that he

7    did not at all say to put in the warrant?

8    A.    Well, he said "two to three hours," then he said, "I smoked

9    one blunt," and then he said, "I smoked a while ago."  And then

10   over the course of the next, you know, 45 minutes, before we got

11   to the precinct, there was someone trying to get into the car;

12   Officer Lentz telling me that there was a gun in the car.  The

13   investigation, you know, required more officers to come out.  We

14   had to fill out paperwork for tow trucks.  And by the time I got

15   to the precinct, I just had all of the statements that he said

16   in my head and made a mistake and accidentally wrote "one hour,"

17   and I should have said "two hours" or "a while ago" or said he

18   smoked "one blunt"; all of those, you know, admitting that he

19   had smoked, but not one hour ago.

20   Q.    At the moment you're writing your report, you're in front

21   of a computer, right?

22   A.    Right.

23   Q.    At the moment you're writing the search warrant affidavit,

24   you're standing in front of a computer, right?

25   A.    Correct.

1    Q.    You could have watched the video if you wanted to be sure,

2    right?

3    A.    I could have.  To watch the video, you have to plug in the

4    body-worn camera.  You have wait for sometimes over an hour for

5    it to upload to the computer and then to start watching it.

6    When you're writing a warrant for a DUI, that warrant needs to

7    be written fairly quickly, because the evidence of DUI is

8    actually leaving the person's body with every hour that you're,

9    you know, working since they've come out of a car.  So it's not

10   something I've never done for DUI when writing my warrant, and I

11   don't see other people do it, and I haven't been trained to do

12   that.

13   Q.    You have been trained to be accurate in your reports,

14   right?

15   A.    Correct.

16   Q.    And when you write a warrant affidavit, you are aware that

17   it swears, under penalty of perjury, that you're telling the

18   truth, right?

19   A.    Yes, I am.

20   Q.    But somehow you came up with "admitting smoking within one

21   hour"?

22   A.    Yeah.  I mean, I'm human.  I made a mistake.  He said

23   several other things like that, like "a while ago" and "one

24   blunt," "two hours," and I made a mistake and wrote "one hour."

25         I don't believe that would have changed the outcome of the

1   warrant had I written any of those other things instead of "one

2   hour."

3   Q.   The reason that you give the warrant to a judge is because

4   the judge is the one who is supposed to decide that, right?

5   A.   Correct.

6   Q.   It's not up to you to decide how to edit the facts to get

7   the result you want.

8   A.   Correct.

9           MR. CARNEY:  Okay.  Nothing further.  Thank you.

10          MS. GREGSON:  I have a very brief redirect, Your

11  Honor.

12          THE COURT:  Okay.

13                     REDIRECT EXAMINATION

14  BY MS. GREGSON:

15  Q.   Officer French, is there a time limit for stopping and

16  standing citations that somehow exists?

17  A.   Not that I know of.

18  Q.   It's simply that you're stopping or standing in a roadway;

19  is that accurate?

20  A.   Accurate.

21  Q.   When you were shown Exhibit 49.1, the still photo taken

22  from the fleet camera, when you turned around to contact the

23  defendant near the Comfort Inn -- are you tracking what I'm

24  saying?

25  A.   Is that his car, or the picture of his face inside of the

1   car?

2   Q.    Fair question.

3           MS. GREGSON:  May I approach?

4           THE COURT:  You may.

5           MS. GREGSON:  Sometimes paper is easier.

6   Thank you.

7   Q.    (By Ms. Gregson)  You have Exhibit 49.1 in front of you?  I

8   guess, technically, it's Docket 49.1.

9   A.    Yes, I do.

10  Q.    Is there a left turn signal on in Mr. Russell's Volvo?

11  A.    I don't see one.

12  Q.    And he was turning left onto northbound 99 from that 137th

13  Street; is that correct?

14  A.    Yes.

15  Q.    Based on his moving the vehicle, based on his rate of speed

16  once you attempted to recontact him, did you develop a suspicion

17  about why Mr. Russell was turning left bound on 99?

18  A.    To drive away from us.

19  Q.    The infraction for the Seattle Municipal Code concerning a

20  visible tag, the temporary license tag, does that require that

21  it's plainly visible to any passerby, including law enforcement?

22  A.    It does.

23  Q.    Was, in fact, Mr. Russell's temporary tag visible really at

24  all?

25  A.    Not to me.

1  Q.    Do you feel that your camera footage, either body-worn or

2  fleet or any stills taken therefrom, adequately depicted the

3  redness or droopy eyes that you saw within inches and feet from

4  Mr. Russell that evening?

5  A.    No.

6  Q.    Do you need DRE training in order to know what a strong

7  smell of marijuana emanating from a car smells like?

8  A.    No.

9  Q.    You testified, and I just want to confirm, that you had

10 observed the open cannabis package and/or blunt prior to

11 accessing the space between Mr. Russell's open door and leg and

12 car door?

13 A.    Right.  I saw it before moving up to the vehicle -- or to

14 the door.

15 Q.    After smelling the marijuana, observing the physical

16 indicators that you talked about with Mr. Russell, and seeing

17 the open container of marijuana in the car, what was your plan

18 with respect to Mr. Russell remaining behind the wheel of that

19 running Volvo, on Highway 99, parked in the left turn lane?

20 A.    Well, I don't think he should have gotten back behind the

21 wheel, and that was a miscommunication between my partner and I.

22 I maybe should've told Officer Lentz, explicitly, "Don't let him

23 back inside of the car because I'm conducting a DUI

24 investigation," but it's not something we usually communicate,

25 and I just expected Officer Lentz to stop him.

1      Can you ask that again?

2  Q.    Did you intend to either pull him from the car if he didn't

3  go willingly or request that he exit the car so that you could

4  get him away from behind the physical control of that Volvo?

5  A.    Yeah.  There was no way I was letting him drive away

6  because I believed he was impaired, and DUIs kill more people in

7  Seattle than -- almost more people than gunshots, so it's

8  something that you have to really investigate and do your due

9  diligence with.

10 Q.    You were questioned about -- you called it a

11 marijuana-looking cigarette, although you don't know that --

12 A.    Right.

13 Q.    -- that was pulled from Mr. Russell's left pocket and

14 placed on the hood of the patrol car.  Could you tell if it had

15 been partially consumed or if it was intact?

16 A.    I couldn't tell.

17 Q.    And do you have a independent memory of that?

18 A.    I don't.

19 Q.    At any point in time, absent Mr. Russell's consent, did you

20 intend to search his car without a warrant?

21 A.    No.

22 Q.    How many impaired drivers, whether it be alcohol or drugs,

23 tell you that they're not impaired when you start investigating

24 them for DUI?

25 A.    Ninety-nine percent.

1  Q.   Are you trained to include every single denial that a

2  person makes about when, how much, or where they consumed

3  marijuana in the circumstance of DUI marijuana?

4  A.   No.

5  Q.   Are you trained, in fact, to include that they admitted

6  smoking marijuana in the day?

7  A.   Yes.

8         MS. GREGSON:  I don't have any further questions.

9  Thank you.

10        MR. CARNEY:  Very briefly, Your Honor?

11        THE COURT:  Yes.

12                      RECROSS-EXAMINATION

13  BY MR. CARNEY:

14  Q.   Officer French, again, when you approached the Volvo in

15  your patrol vehicle, the lights on the top of the car were not

16  on, right?

17  A.   Before we stopped him, they were not on.

18  Q.   Right.

19  A.   Okay.

20  Q.   So he's under no obligation to stop and wait to see if you

21  want to talk to him or if you're just turning around, right?

22  A.   Right.

23  Q.   He has every right to drive away.

24  A.   Yes, he does.

25  Q.   Did you do any math to try and figure out how fast he had

1    gone after he made that turn?

2    A.    No.

3    Q.    And he was behind you while he was driving away, right?

4    You couldn't see?

5    A.    Right, before we turned around.

6    Q.    Okay.  So you don't have any probable cause to believe that

7    he was speeding then, do you?

8    A.    No.

9    Q.    Ms. Gregson asked whether you were trained to include every

10   denial a person makes in a warrant affidavit.  Do you remember

11   that question?

12   A.    I do.

13   Q.    You are trained not to lie, though, right?

14   A.    Correct.

15   Q.    You're trained not to include false information.

16   A.    Right.

17   Q.    And, in fact, at the bottom of the page, it says you're

18   swearing under penalty of perjury that it's all true.

19   A.    Correct.

20          MR. CARNEY:  Okay.  Thank you.

21          MS. GREGSON:  No questions.

22          THE COURT:  I have a few questions, if I might?

23          MR. CARNEY:  Of course.

24          THE COURT:  Officer French, can you tell me, from your

25   training, what is your understanding of how long the smell lasts

1    on a person after they've been smoking marijuana?

2         THE WITNESS:  I believe an hour, maybe two hours.  I

3    think it depends on if they're inside of an enclosed space, like

4    a car, for a long time, or walking around.

5         THE COURT:  And I just want to make sure I understood:

6    Did you say that you smelled the marijuana as you were

7    approaching the car?  When did you first smell it?

8         THE WITNESS:  I smelled it once I was at the window of

9    the car the first time, when I was on the passenger side.

10         THE COURT:  Okay.  And in your training, what are the

11    signs of marijuana impairment?

12         THE WITNESS:  Well, they have what we call glossed

13    over, kind of, watery eyes, red in the eyes, in the whites of

14    the eyes; droopy eyelids.  It doesn't necessarily mean the eyes

15    are all the way closed or something.  Just the eyelids coming

16    down slightly and your eyebrows are up, that's a sign of

17    impairment.  Sometimes excessive sweating can be a sign of

18    impairment.  Slow or slurred or mumbled speech might also be

19    signs.  Smell is a huge indicator for us.  And the presence of

20    marijuana, another big clue.

21         THE COURT:  Okay.  Anything else that you can think

22    of?

23         THE WITNESS:  For signs of impairment?

24         THE COURT:  Yes.

25         THE WITNESS:  Not right now.

1          THE COURT:  Okay.

2     And then, so I know in your report and the testimony you've

3  said he had the glossed over, watery eyes, the red in the eyes,

4  and the droopy eyelids.

5          THE WITNESS:  Right.

6          THE COURT:  Was he excessively sweating?

7          THE WITNESS:  I didn't notice him excessively sweating

8  the entire time.  I think at some point he started to sweat, but

9  I think it would have been hard for me to say that it's because

10 of impairment or just because he was nervous.

11         THE COURT:  Did you think his speech was slowed or

12 slurred?

13         THE WITNESS:  No; just loud.

14         THE COURT:  And then I did have a question about when

15 you were walking back to the car to ask Officer Lentz.  It

16 sounded to me like you were saying, "Did you smell," and then

17 there was a car or motorcycle or something that went through, so

18 I couldn't hear the question.

19    Do you remember what you asked him?

20         THE WITNESS:  Is that when I go back to the car with

21 the license?

22         THE COURT:  Yeah.

23         THE WITNESS:  I don't remember.

24         THE COURT:  Would you be able to tell --

25         THE WITNESS:  Maybe.

```
 1              THE COURT:  -- if you were able to listen to it?

 2              THE WITNESS:  Yeah.  I'm not exactly sure at what

 3    point.

 4              THE COURT:  Can we play that?

 5              MS. GREGSON:  Give me one second, Your Honor.

 6                         (Video is played.)

 7              MS. GREGSON:  This is at 5:35 on Exhibit B of 43.

 8                         (Video is played.)

 9              MS. GREGSON:  Do you want me to replay that?

10              THE COURT:  Could you tell, at all, what you were

11    saying?

12              THE WITNESS:  Yeah.  I asked him if he had any

13    indicators of, we call it "450," but it's indicators of DUI, and

14    he says, "I can't tell," in this clip.

15              THE COURT:  I'm sorry.  Can you tell me what your

16    exact words were, because I don't hear the "450."

17              THE WITNESS:  I think I said "450."  It's hard for me

18    to tell, too.  But that's -- I mean, that's what I remember

19    saying.  I know I said that to him in a different portion of the

20    clip.

21              THE COURT:  Can we try playing it one more time, just

22    to be sure?

23              THE WITNESS:  I think I said, "Do you smell any 450 on

24    him?"

25              THE COURT:  Okay.  And, again, what is 450?
```

1      THE WITNESS:  That's just our code for a DUI.  So it's

2  me asking, Do you smell any alcoholic beverages or marijuana on

3  him?

4      THE COURT:  And can I ask why you were asking him if

5  he smelled marijuana if you were smelling marijuana from the

6  car?

7      THE WITNESS:  I feel like there's no reason not to ask

8  my partner if he's standing there, too.  We work together on

9  most investigations, so...

10      THE COURT:  Can I also ask why you didn't conduct

11  field sobriety tests?

12      THE WITNESS:  Well, the only place that I would feel

13  comfortable conducting those tests in this area would be on the

14  sidewalk, and I asked him to go to a sidewalk, and I didn't

15  feel, at that point, his behavior was compliant with the things

16  I was asking of him.  You know, it took him a while to get out

17  of the car, and then he seemed flustered and nervous.  So for me

18  to try and walk him across traffic and do field sobriety tests,

19  I was afraid he was going to try and leave or fight, but I gave

20  him the opportunity by asking him if he would go to the

21  sidewalk.

22      THE COURT:  How long, in your trainings -- I just

23  don't know the answers to these questions, so I'm just asking.

24      How long after smoking a blunt can a person be impaired?

25      THE WITNESS:  Hours, as far as I know.

1              THE COURT:  And what training have you received

2    regarding what's sufficient to establish probable cause for

3    suspicion of DUI marijuana, in particular?

4              THE WITNESS:  We have training day at the police

5    academy, and about half the day is spent on narcotics.  They

6    actually bring somebody in with all the different narcotics and

7    have you talk about them.  And they bring in a DRE, who, kind

8    of, tells you things to look for.  I believe earlier this year I

9    also conducted a DUI refresher course.  It's an eight-hour

10   course, and it's very similar.  Like, they spend two, three

11   hours talking about narcotics in particular.

12             THE COURT:  And in particular, do they tell you

13   anything you should be -- anything -- like, anything in

14   particular that establishes probable cause for DUI marijuana?

15             THE WITNESS:  Well, I wouldn't say, like, one thing in

16   particular, but all of those clues together.  And, basically,

17   what they've told us is, Look, if you have, you know, two,

18   three, four clues, like the smell, watery eyes, there's

19   marijuana inside the car, that's probable cause, and that person

20   should be arrested.

21        Because if you let them go and they kill somebody, that's

22   on you.

23             THE COURT:  And are you trained about anything in

24   particular about somebody's driving or what you observe when

25   somebody's driving, as far as probable cause for DUI marijuana?

1          THE WITNESS:  Well, in other cases I've worked, the

2     driving's being very slow or they've been in the wrong lane or

3     driving over the centerline or something like that.

4          THE COURT:  Thank you.  I think those are all my

5     questions.

6        Does anybody have questions based on my questions?

7          MS. GREGSON:  I do not.

8        I would ask to call Officer Lentz.

9          THE COURT:  Thank you, Officer.

10                        MATTHEW LENTZ,
          having been first duly sworn, testified as follows:

11

12                      DIRECT EXAMINATION

13    BY MS. GREGSON:

14    Q.   State your name for the record and spell it for the court

15    reporter.

16    A.   Matthew Lentz; M-a-t-t-h-e-w; L-e-n-t-z.

17    Q.   And what is your occupation?

18    A.   Seattle police officer.

19    Q.   How long have you been an officer with the Seattle Police

20    Department?

21    A.   I have been an officer with the Seattle Police Department

22    for about five years.

23    Q.   Were you in law enforcement anywhere prior to Seattle?

24    A.   I was not.

25    Q.   Can you briefly describe the training, focusing more on

1  your DUI investigation and unlawful possession of firearm

2  training than other non-relevant kinds?

3  A.    Yeah.  I worked as a Seattle police officer for about five

4  years, as I said.

5          MR. CARNEY:  Your Honor, can we have the witness

6  identify what he is looking at to answer the question?

7          THE WITNESS:  Oh, this is a resumé.

8          MS. GREGSON:  I provided the dockets.

9          MR. CARNEY:  77-1.

10         MS. GREGSON:  36.1, there's a copy of his statement up

11  there, as well as 77.1, a copy of his resumé.

12         THE WITNESS:  Yeah.  Basically, just states that I

13  have completed the basic law enforcement academy training, DUI

14  training at the academy, and post-BLEA, a training with the

15  Seattle Police Department.

16  Q.    (By Ms. Gregson)  What is that?

17  A.    Post basic law enforcement academy.

18  Q.    Thank you.

19        And what is your typical -- I would call it "beats," but, I

20  guess, jurisdictional area that you work?

21  A.    At that time, it was mainly the Aurora corridor, from about

22  105 to 145.

23  Q.    All right.  And you say "at that time."  Are you referring

24  to July of 2023?

25  A.    That is correct.

1  Q.   And can you briefly describe your duties as patrol officer

2  in that section of the town?

3  A.   Responding to 911 calls, primarily.  And when we had

4  opportunities, we would work proactively, just looking for

5  crimes that people may be committing.

6  Q.   Such as drunk driving?

7  A.   Yep.

8  Q.   Or impaired driving?

9       How many DUI investigations have you conducted since

10 July -- or by July of 2023?

11 A.   I believe about 15.

12 Q.   And were you the primary on all 15, or secondary as well?

13 A.   On those, I believe I was primary.

14 Q.   Any estimate as to how many you were secondary on?

15 A.   I don't recall.  I've worked with Officer French for most

16 of that time.  So probably, at least, double that.

17 Q.   Of those, how many were drug DUIs, marijuana specifically,

18 versus alcohol?

19 A.   I don't recall exactly.  Primarily -- the ones that I was

20 primary on were alcohol DUIs.

21 Q.   All right.  Do you feel you have more experience and

22 knowledge with respect to alcohol DUIs as opposed to marijuana?

23 A.   Absolutely.

24 Q.   Were you on duty July 17th of 2023?

25 A.   I was.

1    Q.    Who was your partner?

2    A.    Officer French.

3    Q.    Who was tasked with driving the patrol car that evening?

4    A.    I was.

5    Q.    Are you familiar with area of Highway 99, or Aurora,

6    interchangeably, and North 137th Street?

7    A.    I am.

8    Q.    What kind of activities are associated with that area of

9    town?

10   A.    Primarily -- well, that intersection, especially, there is

11   a lot of transient activity, prostitution, loitering, drug

12   activity.

13   Q.    And are those activities typically occurring later in the

14   evening and early morning hours?

15   A.    Yeah.

16   Q.    Are you familiar with the Comfort Inn, which is a motel off

17   of Aurora and 137th Street?

18   A.    I am.

19   Q.    What information did you have prior to this investigation

20   about the motel owner's contacting the Seattle Police

21   Department?

22   A.    They had asked us to just keep an eye on the area.  They

23   had people parking in the area; requested us to watch and keep

24   people out of that area.

25   Q.    In your training and experience, why would cars stop or

1   stand in a roadway on Aurora or just off of Aurora Avenue in the

2   middle of the night?

3   A.    At that time, yeah, probably soliciting prostitution or,

4   you know, involved in human trafficking, potentially.

5   Q.    Like as a, quote/unquote, pimp?

6   A.    Yeah.

7   Q.    Do you recall, generally, what kinds of incidents you guys

8   were -- you and Officer French were responding to prior to your

9   contact with the defendant in this case?

10  A.    You know, it was a while ago.  I believe we were going to a

11  call at an apartment building that was relatively near.  I don't

12  recall what the call was, but just a general 911 call.

13  Q.    Do you recognize the defendant in court from an incident on

14  July 17th of 2023?

15  A.    I do.

16  Q.    And can you identify him by an article of clothing?

17  A.    Brownish shirt.

18        MS. GREGSON:  I'd ask the record reflect that Officer

19  Lentz properly identified Keith Russell.

20        THE COURT:  The record will reflect he identified

21  Mr. Russell.

22  Q.    (By Ms. Gregson)  Can you tell us when you first noticed

23  Mr. Russell in his Volvo?

24  A.    When I first saw Mr. Russell in his Volvo was when we were

25  stopped at 125 and Aurora.  Prior to that, I didn't see him in

1    the car.

2    Q.    When did you first see the car?

3    A.    At 137 and Aurora, as we were going to the call that we

4    were dispatched to.

5    Q.    All right.  And, roughly, what time was that?

6    A.    Oh, shoot, um, one --

7    Q.    There is an exhibit up there, if you need it, 136.1, and

8    it's specific to your incident report, which, I think, is page

9    21, and it should be within your reach.  It should have been

10   near your resumé.

11   A.    01:33 hours is when I said that we were dispatched.  Yeah,

12   01:33 hours.

13   Q.    And how much time elapsed between when you first noticed

14   the Volvo in that location near the Comfort Inn and when you saw

15   it for a second time?

16   A.    About maybe 10 to 15 minutes.

17   Q.    And is stopping and standing in a roadway a traffic

18   infraction under the Seattle Municipal Code?

19   A.    It is.

20   Q.    And does there have to be a sufficient period of time or a

21   specific way that you're stopping or standing in traffic?

22   A.    Say it again.

23   Q.    Is there some --

24   A.    Like, he wasn't sitting there with his hazards on or

25   anything or like he was in -- you know, had mechanical troubles

1    or anything like that.  I don't know if there's a sufficient

2    amount of time...

3    Q.    What I'm asking is, does the municipal code spell out that

4    the car has to be sitting, standing in traffic for, you know, 20

5    minutes for it to be an infraction?

6    A.    I don't believe so.

7    Q.    All right.  And based on your experience and your

8    observations of his vehicle, was he in violation of the

9    municipal code, which is 1172, dot, dot, dot, 000?

10   A.    Yeah.

11   Q.    What did you and Officer French do when you observed his

12   Volvo in the same location when you were finished with your 911

13   call?

14   A.    Turned onto 137 from -- I believe we were probably coming

15   southbound -- off of Aurora, saw the vehicle, spun around to

16   talk to him.

17   Q.    And what did the defendant's Volvo do once you began to

18   turn around the car?

19   A.    Quickly left that area.

20   Q.    All right.  In front of you on the witness stand is a

21   document, a photograph that is Exhibit No. 49.1, or dash 1.  Do

22   you have that?

23   A.    I do.

24   Q.    Do you appreciate or recognize what that photograph

25   depicts?

1    A.    Yes.

2    Q.    And what does it depict?

3    A.    It looks like northbound on Aurora at 137 and Aurora.  So

4    we would have been heading northbound at this point.

5    Q.    Is that the white Volvo that Mr. Russell was driving?

6    A.    I mean, it looks like it, yeah.

7    Q.    Do you know whether or not there is a left-hand turn signal

8    on?

9    A.    I can't see that.

10   Q.    Once you were turning around, what direction did the Volvo

11   go?

12   A.    Southbound.

13   Q.    When you first saw the Volvo and you were trying to make

14   contact with it, did you have any idea who it was registered to?

15   A.    No.

16   Q.    Did you have any opportunity to see the driver of the

17   vehicle?

18   A.    No.

19   Q.    Could you see any visible posted license on the vehicle?

20   A.    No.

21   Q.    Is a lack of a visible license plate or a temporary tag an

22   infraction?

23   A.    Yes.

24   Q.    And is that Seattle Municipal Code 11.22.080?

25   A.    Yes.

1  Q.   Have you had an opportunity to review the fleet-cam footage

2  of your contact with the defendant Mr. Russell?

3  A.   I have.

4  Q.   Is there a lag between when the video starts and when the

5  audio of your either body-worn or fleet camera starts?

6  A.   Yeah.  There's a minute buffer between -- when we activate

7  the cameras, it buffers a minute back.

8  Q.   I am not going to play the fleet-cam footage, but I'm going

9  to ask you some questions about it and can move to certain

10 sections, if that's helpful to you.

11 A.   Sure.

12 Q.   What was your impression of how the defendant drove in

13 order to get the space between turning onto 99 and you trying to

14 catch up?

15 A.   137 is where we initially saw the vehicle.  By the time we

16 caught up to him, he was at 125 and Aurora.  It took us a minute

17 to get there, so it seemed like he was traveling pretty fast.

18 Q.   Would you have any suspicion about why or whether or not

19 the Volvo and the driver wanted to have contact with you when

20 you were turning around your vehicle?

21 A.   Did not want to have contact with us, or?

22 Q.   Did you have a feeling one way or the other?

23 A.   It seemed like he was trying to get away from us.

24 Q.   When you first got behind the Volvo, what lane was it in?

25 A.   I believe it was in the right lane.

1   Q.   All right.  And once you were able to catch up to it, did

2   the Volvo switch lanes?

3   A.   Yes.

4   Q.   Did you have any suspicions about why that happened?

5   A.   It seemed like he was maybe trying to pull over somewhere

6   other than where we wanted him to pull over.  Honestly, I'm not

7   really sure.  That's what it seemed like to me.

8   Q.   When you activate your lights as a Seattle police officer,

9   what side of the road are people supposed to pull off to?

10  A.   To the right.

11  Q.   And on the right-hand side of Aurora Avenue, were there

12  businesses and locations that were empty and would have been

13  amenable to having you pull behind the defendant?

14  A.   Yes.

15  Q.   Instead, when you activated your lights, what did the

16  defendant do?

17  A.   Pulled into the left-hand turn lane to turn left onto 125.

18  Q.   And, again, what cross street was that on?

19  A.   125 and Aurora.

20  Q.   How would you describe that intersection of southbound 99

21  and 125th?

22  A.   It's busy.  There's always traffic.  There's always

23  activity.  There's ample places to pull over on the right side,

24  including a bus lane.  There's parking lots.  But it's a very

25  busy intersection.

1  Q.    What safety concerns did you have at that moment when the

2  car that Mr. Russell was driving stopped in the middle of Aurora

3  in the middle of the night in the left-hand turn lane?

4  A.    I was confused by why he would be pulling to the left.  It

5  made it seem like he was trying to stop where he wanted to stop

6  as opposed to where we wanted to him to stop, which raises

7  concern for officer safety.

8  Q.    Why?

9  A.    Well, the longer somebody is, potentially, in a vehicle

10 refusing to stop makes me believe they might be trying to hide

11 something or prolong the amount of time that they get to be

12 inside their vehicle and hide things, potentially.

13 Q.    Does it seem accurate that you activated your lights and

14 the defendant stopped within approximately a block?

15 A.    You know, I don't recall.  I'd have to look at the video

16 again.

17 Q.    Okay.

18       There's discussion on that fleet cam.  Are you familiar

19 with the discussion that you and Officer French have about

20 movement in the vehicle before you guys approach the Volvo and

21 Mr. Russell?

22 A.    Yeah.  It seemed like there was movement inside the

23 vehicle.  I really couldn't see what was happening inside there.

24 Q.    And why?  Why could you not see what was happening in

25 there?

1  A.   The vehicle's windows were heavily tinted.

2  Q.   Legally tinted, do you think?

3  A.   I don't think so.

4  Q.   And did you have any discussion about Officer French's

5  observation about a hand sticking out of a sunroof?

6  A.   I heard him say something about a hand coming out of the

7  sunroof, but I didn't see that.

8  Q.   You were driving?

9  A.   I was.

10  Q.   Where was your attention focused when you were driving?

11  A.   Well, the road, and trying to see what was going on with

12  the driver in the driver's side of the vehicle, but I couldn't

13  see inside.

14  Q.   What is significant about a person, such as Mr. Russell,

15  sticking their hand out the sunroof window as you're trying to

16  get behind them and pull them over?

17        MR. CARNEY:  Your Honor, I'll object to this

18  questioning.  He's already stated he didn't see that.

19        THE COURT:  Sustained.

20  Q.   (By Ms. Gregson)  Officer Lentz, you were present in the

21  vehicle when Officer French informed you that he observed that,

22  correct?

23  A.   Yes.

24  Q.   What impressions and concerns did you form at that point in

25  time, based on these observations of Officer French?

1  A.    That they were, potentially, furtive movements; that he was

2  trying to either just throw something out the window or -- I'm

3  not really sure.  It was concerning to me, because I wasn't sure

4  what he was doing.

5  Q.    Do you recall whether or not you could see this movement

6  that Officer French reported when you reviewed either your

7  body-cam footage or the fleet-cam footage?

8  A.    I couldn't see it in the body-cam or the fleet-camera

9  footage.

10  Q.    What is your impression of the fleet-cam footage, the video

11  quality?

12  A.    It's poor.  It's not great.

13  Q.    Could you see any temporary license in the back window of

14  Mr. Russell's Volvo when you reviewed the fleet-cam footage?

15  A.    I could not.

16  Q.    How did you determine who would take the driver side of the

17  Volvo when you approached, as opposed to who would take the

18  passenger side?

19  A.    Well, I was on the driver side because I was driving, so I

20  naturally approached the driver's side of the defendant's

21  vehicle.

22  Q.    And when you initially make contact with the defendant and

23  he's seated in his Volvo, what was the first observation you

24  made?

25  A.    I could smell marijuana inside the vehicle.

1  Q.   Is it accurate that a person can be charged with driving

2  under the influence or physical control if they have a certain

3  level of marijuana in their system?

4  A.   Yes.

5  Q.   Though personal consumption of marijuana has been legalized

6  by Washington State, to your knowledge, in July of 2023, was it

7  legal, federally?

8  A.   No.

9  Q.   When you were talking to Mr. Russell after Officer French

10 went to run his name and the registration of the vehicle, was

11 there any communication at that point in time between you and

12 Officer French?

13 A.   No.

14 Q.   Did you know, at any point in time during this

15 investigation for DUI, that Mr. Russell was a convicted felon

16 and not eligible to possess a firearm?

17 A.   I did not know that.

18 Q.   When you first contacted Mr. Russell and you were speaking

19 with him, do you recall when you observed the marijuana

20 container in the vehicle?

21 A.   No, I can't remember exactly when I saw that.

22 Q.   Is an open container of marijuana allowed by Washington law

23 to be in a vehicle?

24 A.   Not in that area.  I believe if you have it in the trunk,

25 you can have that.  But, no, you're not allowed to have it in

1    the car.

2    Q.   Do you recall a citizen engaging during your contact with

3    Mr. Russell?

4    A.   Yes.

5    Q.   And can you explain what concerns you had about this

6    individual?

7    A.   He was coming up to try to take the car.  Mr. Russell, the

8    defendant, was saying that he was getting arrested and was

9    telling this guy to take the car.

10   Q.   And at that point in time, were you aware that the car had

11   a gun in it?

12   A.   I was.

13   Q.   Had you told Officer French?

14   A.   I had not.

15   Q.   What was your concern about this citizen taking

16   Mr. Russell's car?

17   A.   Well, I was worried he was going to take the car that had

18   the firearm in it, or go to the car, produce the firearm, and

19   potentially use it to assault officers.

20   Q.   Did it become obvious to you that Mr. Russell knew this

21   citizen who was approaching?

22   A.   Yeah, it seemed like he did know him.

23   Q.   Do you recall, at the 10:15 mark of Docket 43, Exhibit A,

24   when Officer French was doing a search incident to arrest and he

25   removed something from the defendant's left pocket?

1    A.    Yes.

2    Q.    Do you recall what you observed that to be?

3    A.    It looked like a marijuana cigarette, a joint or something.

4    Q.    Do you recall the condition, whether it was perfectly

5    intact or partially smoked, or anything about it?

6    A.    I don't recall exactly.  It did not look -- I don't know.

7    I don't remember.

8    Q.    Do you know what happened to it?

9    A.    I don't know what happened to it.

10   Q.    When you were processing the evidence, do you recall

11   informing Officer French that there was a gun under the seat?

12   A.    After we had taken the defendant into custody and placed

13   him in the back of our patrol car, we were gathering things that

14   we'd taken out of his pocket, and that's when I told Officer

15   French that I'd seen a gun under the front seat.

16   Q.    Are you familiar with the body-worn camera from the night

17   of July 17th, 2023, documenting Mr. Russell's arrest?

18   A.    I am.

19   Q.    And have you watched this body-worn camera, which, for our

20   purposes, is Docket 43, Exhibit C?

21   A.    Yes.

22   Q.    Does it accurately capture the events of the day?

23   A.    Yes.

24   Q.    I'm going to play portions of this and ask you some

25   questions.  I'm going to start at 1:08.

1                          (Video is played.)

2    Q.    How many times during your interaction with Mr. Russell did

3    he inform you that he had his license and insurance, regardless

4    of what question you asked?

5    A.    I mean, at least over a dozen.  Several times he said it

6    there.

7    Q.    Was that significant to you as you were investigating him

8    for DUI?

9    A.    Yeah.

10   Q.    Why?

11   A.    He was very repetitive.  Even though we were asking him

12   other questions, he continued to -- it seemed like he was stuck

13   in a loop.

14   Q.    And you actually are the person who shut the car door at

15   that point; is that correct?

16   A.    You know, I think so, yeah.  I didn't notice just then, but

17   I think you're right.

18                          (Video is played.)

19   Q.    And you were shining your flashlight into the Volvo.  Why

20   are you doing that?

21   A.    Checking for weapons or things that might be within his

22   reach.

23   Q.    And for what purpose?

24   A.    Officer safety.

25   Q.    And that's at approximately the three-minute, ten-second

1  mark?

2                          (Video is played.)

3  Q.   Did you hear Officer French instruct the defendant that he

4  could not go retrieve the registration at that point in time?

5  A.   I did not.

6  Q.   Do you recall whether or not the Volvo was actually

7  running?

8  A.   I believe it probably was.  I don't recall whether or not

9  he turned it off.

10  Q.   Did you instruct the defendant that he should go grab his

11  registration, or did he tell you he's about to grab it?

12  A.   He just said, "I'm going to go grab it."

13  Q.   Did you tell him that he could go grab it?

14  A.   Uh, you know, I don't remember.

15  Q.   I'm going to back it up so you can listen.

16  A.   Okay.

17                          (Video is played.)

18  Q.   So when you say, "Where's the registration," was that an

19  invitation for him to go back into the vehicle?

20  A.   Yeah, it seems like it.  He said, "It's in the car," and I

21  said, "All right."

22  Q.   So in hindsight, if the car is running, marijuana is

23  smelled at the inception of contact with him, should he have

24  been allowed to get back in the vehicle?

25  A.   No.

1  Q.   All right.  What's the concern?

2  A.   For one, that he would take off, or if he did have weapons

3  that I couldn't see, like in the glove box, when he was reaching

4  for the registration he could have produced another weapon out

5  of there.

6  Q.   If he's impaired and he's driving, do you have additional

7  concerns?

8  A.   Absolutely.

9  Q.   What?

10 A.   I don't want him taking off.

11 Q.   You don't want him getting in an accident?

12 A.   Yeah, absolutely.

13                    (Video is played.)

14 Q.   At this point, the car door is open.  How would you

15 describe the positioning of Mr. Russell's body?

16 A.   In and out of the car.

17 Q.   Is one leg of his actually physically out of the car?

18 A.   It is.

19 Q.   Can you see into the driver's side door compartments at

20 that point in time, based on your body-cam footage?

21 A.   Yes.

22 Q.   And is this when you observed the open container of

23 marijuana and a blunt?

24 A.   I would have seen it, yeah, at that point.

25 Q.   Hindsight being the benefit, is there anything unusual

1  about how Mr. Russell positioned his body, now that you've

2  looked at the body-worn camera, knowing that there was a firearm

3  underneath the seat?

4  A.   Yeah.  Seems like he would have been trying to cover that

5  area.

6                           (Video is played.)

7  Q.   You didn't expand the opening of the car at that point, did

8  you?

9  A.   No.

10                          (Video is played.)

11 A.   I had both of my hands on his paperwork.

12 Q.   Why did you explain your concerns about what people do when

13 they're moving around the car?

14 A.   He was asking why we were there, so I was just explaining

15 what was going on, trying to deescalate the situation, calm him

16 down, and let him know what was happening, why we were doing

17 what we were doing.

18 Q.   In looking at the windows, do you believe they were legally

19 tinted?

20 A.   No.

21                          (Video is played.)

22 Q.   I have a couple of questions for you about the things that

23 happened in the time leading up to the 6:21 mark.

24      Why is your flashlight pointed in the location that it's

25 pointed?

1    A.    Right now, because I saw a gun.

2    Q.    All right.  And were you always parallel to the door, or

3    had you been behind the driver's door while Officer French was

4    speaking with the defendant?

5    A.    Say that again.

6    Q.    Had you always been parallel to either the defendant or

7    next to Officer French, or had you been around the other side of

8    the door as well?

9    A.    I'm not really sure how to explain that.

10         So prior to this, I was standing approximately where

11   Officer French is standing now.  When Officer French approaches,

12   I backed up and moved away from that area so Officer French

13   could speak with Mr. Russell.

14   Q.    And when did you start to gain an appreciation that there

15   was a firearm underneath Mr. Russell's leg that was placed in

16   the middle of his floor mat?

17   A.    When I saw it.  I mean, yeah, as soon as I saw it, I -- I

18   told him to get out of the car.

19   Q.    Okay.  And did you know whether or not he was a felon at

20   that point?

21   A.    I did not.

22   Q.    Did you have any beliefs about whether or not the firearm

23   was legally in his possession?

24   A.    I didn't know.  I mean, to my knowledge, he could have had

25   a CPL.  I didn't know that.

1    Q.    A CPL?

2    A.    A concealed pistol license.  So he could have legally had

3    the firearm in his possession, or owned it, but for officer

4    safety reasons, I didn't want him there if he's impaired and

5    getting escalated and having a firearm in his reach.

6    Q.    So what was the reason that you asked him to exit the car?

7    A.    To get him away from the gun.

8    Q.    If you knew there was a gun in the car, why wouldn't you

9    just grab your own firearm and instruct him to get out of the

10   car, or something more drastic?

11   A.    I could have.  I did not want to escalate the situation or

12   cause alarm to Officer French.

13                    (Video is played.)

14   Q.    What was your impression of Mr. Russell's fear of the car

15   being searched without a warrant or with no consent?

16   A.    He didn't -- he knew that he had a firearm, he knew that he

17   wasn't legally allowed to have it, and he didn't want us to go

18   in the car and find it.

19   Q.    And would you have accessed the car without a warrant or

20   consent?

21   A.    No.

22   Q.    Why did you defer to Officer French when he returned from

23   running the defendant's name to, sort of, interacting with the

24   defendant, since you had been previously interacting with him?

25   A.    Officer French has more experience with DUIs, and so --

1  yeah, I would trust him making the decision on whether or not

2  the subject was DUI or not.  I didn't want to be conducting any

3  of that investigation on my own without him present as well.

4  Q.   In your partnership, do you reach consensus, or is it more

5  of an every-officer-for-himself scenario?

6  A.   Well, we work together, so I wouldn't say we would make

7  decisions independently.  I think we have worked together long

8  enough to where we can -- we have an understanding of what's

9  going on with the incident and the direction that it was going.

10  Q.   Okay.  I'm going to move away from the exhibit we were just

11  discussing.

12       Have you had occasion to review your incident report that

13  you wrote, which, for our purposes, is Docket 46.1, page 21?

14  A.   I have.

15  Q.   And is it accurate?

16  A.   Yes.

17  Q.   And please describe the factors that you considered when

18  determining there was probable cause to arrest the defendant

19  for, at that point, DUI.

20  A.   Open container of marijuana in the car, the smell of

21  marijuana, the way he was acting.

22  Q.   And by "acting," could you be really specific so the record

23  is clear?

24  A.   Continued to repeat the same statements over and over

25  again, slowly getting more and more escalated the further the

1    situation -- the more investigation we did.

2    Q.    Did you have an observation about his eyes being -- showing

3    any level of impairment consistent with marijuana smoking?

4    A.    I don't recall.

5    Q.    Okay.  And have you gone through and, like, attempted to

6    look through your body-worn camera or the fleet-cam footage --

7    A.    I have.

8    Q.    -- for any additional evidence?

9    A.    I have.  I wouldn't rely, personally, on what I could see

10   in the body-worn camera for my recollection of what his eyes may

11   have looked like, because it might not be accurate.

12   Q.    In what way?

13   A.    I mean, it's a camera, so it's not going to accurately

14   depict what, you know, might actually -- what the situation

15   looked like.  In this situation, especially if we have

16   flashlights shining on -- the whites from his eyes might reflect

17   whiter than they actually appeared in person.

18   Q.    When you're wearing your body-worn camera, assuming, let's

19   say, you and Mr. Russell are the same height and your eyes

20   match, where on your body is the body-worn camera placed?

21   A.    Right here.

22   Q.    So the lower --

23   A.    It would be right around his eye level or head level, if

24   he's sitting in the car.  If he's standing up, it's similar,

25   chest level.

1   Q.   Ultimately -- sort of fast-forwarding -- you did execute a

2   search warrant on his Volvo after judicial approval; is that

3   correct?

4   A.   Yes.

5   Q.   And what did you recover?

6   A.   A firearm, a stolen 9mm handgun under the seat; a

7   container -- open container of marijuana; a cell phone; and a

8   blunt.

9        MS. GREGSON:  I don't have any further questions.

10  Thank you.

11                    CROSS-EXAMINATION

12  BY MR. CARNEY:

13  Q.   Afternoon, Officer Lentz.

14  A.   Afternoon.

15  Q.   You mentioned that there were some reports or a report from

16  the motel about people parked near the motel, right?

17  A.   That's correct.

18  Q.   Nobody called to tell you that a white Volvo was parked

19  that day, right?

20  A.   I don't believe so.

21  Q.   Okay.  Nobody had complained about anything that

22  Mr. Russell was doing?

23  A.   Not that I'm aware of.

24  Q.   You mentioned that you thought he was trying to avoid you

25  when you pulled up next to him.  He has the right to do that,

1  though, right?

2  A.    Sure.

3  Q.    In fact, if you walked up to someone on the street and

4  asked them if they would stop and talk to you, they would have

5  the right to walk away, right?

6  A.    On a social contact, yes.

7  Q.    And they'd have the right to not even respond, right?

8  A.    Yes.

9  Q.    When you approached the window of Mr. Russell's car after

10 he had stepped out of it, the window was rolled down, correct?

11 A.    Yes.

12 Q.    And you shone your flashlight into the car.

13 A.    Okay.

14 Q.    Is that right?

15 A.    Yes.

16 Q.    The purpose of that was to search for officer safety,

17 right?

18 A.    Yes.

19 Q.    You were looking for a gun.

20 A.    No.  I was looking for any kind of weapon or anything he

21 could use to harm an officer.

22 Q.    Certainly included a gun, right?  Didn't find it.

23 A.    Not at that point, no.

24 Q.    And you must not have, because it was after that that you

25 gave him permission to get back into the vehicle.

1  A.    Yes.

2  Q.    Following that, you stood in the swing space of his

3  driver's door while he got the materials out of the glove box,

4  right?

5  A.    I was -- I don't know that I'd say I was in the swing

6  space.  I mean, how do you define that?

7  Q.    The door would have hit you if he'd closed it, right?

8  A.    I don't know that.

9  Q.    Okay.  Let me show you a couple things, and we'll see if we

10  can clear it up.

11  A.    Okay.

12  Q.    This is Exhibit 36.11.  This is from Officer French's body

13  camera.  Who's that standing in the swing space of the door?

14  A.    I'm standing by the door, but I still don't know if I could

15  say that I'm standing in the swing space.

16  Q.    Doesn't it appear to you that the door would have hit you

17  if it had been closed while you were standing there?

18  A.    I can't say for certain, no.

19  Q.    Okay.  Let's take a look at Exhibit 36-12.

20       Would the door have hit you if it had been closed while you

21  were standing there?

22  A.    I can't tell from that angle.

23  Q.    You can't?

24  A.    No.

25  Q.    Okay.

1    When you shone your flashlight into the car, did you put

2    your hand inside the car to do that?

3    A.    I don't believe so.

4    Q.    Why not?

5    A.    I didn't need to.

6    Q.    You didn't need to in order to check for what you were

7    looking for; is that what you mean?

8    A.    Yeah.

9    Q.    Okay.

10        I'm going to show you some of the video.  This is

11   Exhibit 36-9.  This is Officer French's body-worn camera.  I'm

12   going to move to about 2:45.  Let's just start here.

13                        (Video is played.)

14   Q.    Did you put your flashlight and your hand inside the car,

15   through the window?

16   A.    I can't tell.  It looks like maybe I had.

17   Q.    You can't tell?

18   A.    I can't tell.

19   Q.    Is that something you might have done?

20   A.    It's possible.

21   Q.    Do you know of any reason why you shouldn't do that?

22   A.    Well, I didn't have permission to go inside the vehicle.

23   Q.    Did you ask for it?

24   A.    No.

25   Q.    Ms. Gregson asked you whether or not, to your knowledge,

1  marijuana had been legalized federally as of July of 2023.  Do

2  you recall that?

3  A.   Yes.

4  Q.   In the time since Washington State legalized possession of

5  marijuana, have you ever arrested a person for a federal

6  violation of possessing marijuana?

7  A.   No.

8  Q.   In fact, the police department that you work for has a

9  policy that you should not do so, correct?

10 A.   Yeah.

11 Q.   Sorry.  I couldn't understand you.

12 A.   Yes.

13 Q.   So under no circumstances would you have arrested a person

14 for possessing marijuana on the basis that it violated federal

15 law?

16 A.   No.

17 Q.   Okay.  I'm going to direct your attention to a different

18 exhibit.  This one is 36-21.  Sorry, no.  36-1 at page 21.  Do

19 you see where the cursor is on the screen?

20 A.   Yes.

21 Q.   It says, "Officer French and I searched Russell incident to

22 arrest.  I searched Russell's right pants pocket and found a

23 large amount of cash."

24 A.   Yep.

25 Q.   Does it say that Officer French found what appeared to be a

1    marijuana cigarette anywhere on his person?

2    A.    No.

3    Q.    Okay.  I'm going to refer you to 36-1 at page 5.  Do you

4    see where the cursor is?

5    A.    Yes.

6    Q.    Okay.  It says, "Search incident to arrest, I found the

7    keys to the vehicle in his front sweatshirt pocket.  Officer

8    Lentz found a stack of cash in his front right pant pocket."

9    A.    Uh-huh.

10   Q.    Does it say anything about finding a cigarette, marijuana

11   or otherwise?

12   A.    No.

13   Q.    So neither of you recorded in your reports anything about

14   finding a marijuana cigarette or a cigarette that could have

15   been marijuana?

16   A.    That's correct.

17   Q.    Next, I'm going to show you 49-2.  This is the photograph

18   that you took at the precinct of the evidence that was recovered

19   from Mr. Russell's person and his car, correct?

20   A.    That's correct.

21   Q.    You would agree with me that the blunt along the left side

22   there has never been lit.

23   A.    That's true.

24   Q.    In fact, nothing on this page is marijuana that has had

25   fire applied to it, as he said.

1   A.    Yes, that's correct.

2   Q.    Okay.

3         Now, you mentioned that you were concerned by Mr. Russell's

4   repetitive speech, right?

5   A.    Uh-huh.

6   Q.    In fact, that first moment, when Ms. Gregson showed you the

7   video, you pointed out that he said, "I have license and

8   insurance" several times in rapid succession.

9   A.    Uh-huh.

10  Q.    But it was after that that Officer French asked you if you

11  saw any indications of intoxication, right?

12  A.    Yes.

13  Q.    And at that point, what you said was, "I don't know, I

14  can't tell."

15  A.    Yes.

16  Q.    You did not say, "I'm concerned that he might be drunk or

17  high."

18  A.    I did not say that, no.

19  Q.    You did not say, "I believe there is probable cause to

20  arrest for DUI."

21  A.    Nope.  I didn't say that yet.

22  Q.    As soon as Officer French came back to the vehicle, the

23  first thing he did was to start asking about the unburned

24  marijuana in the driver's pocket and pushed the door farther

25  open, correct?

1    A.    He was asking about the marijuana and talking to

2    Mr. Russell, yeah.

3    Q.    And he pushed the door farther open, right?

4    A.    Yeah.  I don't know if his intention was to push the door

5    open or to just be able to more accurately speak with

6    Mr. Russell.

7    Q.    Regardless of what his intention might have been or what

8    your perception of his intention might be, what he, in fact, did

9    was place his hand on the door and cause it to open farther,

10   correct?

11   A.    Yes.

12   Q.    You had been holding your flashlight that whole time,

13   right?

14   A.    Uh-huh, yes, I believe so, yeah.

15   Q.    Sorry.  I need you to answer out loud.

16   A.    Yes.

17   Q.    You had been standing either in the swing space of the door

18   or very close to it, right next to Mr. Russell.

19   A.    Prior to that?

20   Q.    Prior to Officer French returning.

21   A.    Yes.

22   Q.    You'd been speaking to him?

23   A.    Yes.

24   Q.    When he went to the glove box, he correctly identified the

25   documents that he needed to give to you with no difficulty,

1    right?

2    A.    Yes.

3    Q.    What he handed you was, in fact, a valid registration and a

4    valid certificate of insurance.

5    A.    Yes.

6    Q.    Didn't hand you any of the wrong documents.

7    A.    No.

8    Q.    Didn't drop any of them.  Didn't seem confused about which

9    ones they were.

10   A.    No.

11   Q.    Okay.  So you're standing there with your flashlight in

12   your hand, and at all times you're thinking about officer

13   safety, right?

14   A.    Yes.

15   Q.    Always wondering whether there might be a weapon somewhere

16   nearby?

17   A.    Yes.

18   Q.    Didn't find one?

19   A.    At that point, no.

20   Q.    In fact, you only found the weapon after Officer French

21   pushed the door further open, right?

22   A.    Yes.

23   Q.    Because before that, you couldn't see it.

24   A.    Yes.

25   Q.    You only could see it after the door was pushed open.

1    A.    Yes.

2    Q.    Did either of you ask permission to push the door open?

3    A.    No.

4         MR. CARNEY:  Okay.  Thank you.  No further questions.

5         MS. GREGSON:  Your Honor, redirect?

6         THE COURT:  You may.

7         MS. GREGSON:  Thank you.

8                    REDIRECT EXAMINATION

9    BY MS. GREGSON:

10   Q.    On any of the body-worn or fleet-camera videos that you

11   were shown by defense counsel, do you agree that your flashlight

12   is depicted entering the vehicle?

13   A.    Do I agree that it was entering the vehicle?

14   Q.    Yes, based on any of the footage that you were shown.

15   A.    I mean, if it did, it was unintentional.

16   Q.    Did you see it go through?

17   A.    I -- I couldn't tell.  Definitively, I couldn't say that,

18   yes, my flashlight went into the vehicle.

19   Q.    You were asked about marijuana consumption and the products

20   not being consumed in the vehicle.

21         In your experience as a law enforcement officer, what is

22   done with marijuana products that are consumed inside a vehicle

23   when they are done being consumed?

24   A.    Probably discarded.

25   Q.    Were you surprised that you did not ultimately find

1  consumed marijuana products when you executed the search warrant

2  on Mr. Russell's car?

3  A.    No.

4  Q.    Did you agree with Officer French's determination of

5  probable cause to arrest for DUI?

6  A.    Absolutely.

7  Q.    Do you recall watching the portion of the video where, I

8  think you call it a "450"?

9  A.    Yeah.

10 Q.    What was your thought process when Officer French asked you

11 about 450?

12 A.    I was thinking that I -- I wasn't sure at that point yet,

13 but we weren't done with the investigation, and I trust Officer

14 French's decision-making process, and I support him in the

15 decisions that he makes when he believes that he has probable

16 cause to arrest.

17 Q.    Would you have felt comfortable with the defendant driving

18 off at that point?

19 A.    No.

20 Q.    Was the defendant arrested for unlawful possession of the

21 firearm at that point?

22 A.    No.

23 Q.    What crime was the defendant arrested for?

24 A.    DUI.

25 Q.    Did you even know the defendant was a convicted felon when

1  he was asked to step out of the car and placed under arrest?

2  A.   I did not.

3  Q.   Does it matter that -- let me think how I want to say this.

4       MS. GREGSON:  I think I'll end with that, Your Honor.

5  Thank you.

6       MR. CARNEY:  Very briefly, Your Honor?

7       THE COURT:  Yes.

8                      RECROSS-EXAMINATION

9  BY MR. CARNEY:

10 Q.   When Officer French asked you about signs of impairment,

11 you didn't know at that point.

12 A.   No, I wouldn't say that.

13 Q.   Why did you tell him you didn't know, then?

14 A.   I wasn't sure.  I was, like, "I'm not sure."

15 Q.   So based on everything that the two of you had seen up to

16 that point, you weren't sure whether there was probable cause to

17 arrest for DUI.

18 A.   I was -- if it were me there by myself, I would probably

19 continue -- I don't know that I would have made the arrest by

20 myself.  But I trust Officer French's ability to make those

21 determinations, more so than my own.  He has more experience,

22 especially with drug DUI arrests, at that point.  So if he

23 believes there's probable cause at that point, I trust him.

24       MR. CARNEY:  All right.  Thank you.

25       MS. GREGSON:  One final question, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MS. GREGSON:

3    Q.    Officer Lentz, when you were asked about the 450, or

4    whatever the phrase is, by Officer French, and you said you

5    weren't sure --

6    A.    Yeah.

7    Q.    -- is it fair -- is it accurate to say that the

8    investigation continued and Officer French continued to speak

9    with the defendant before ultimately placing him under arrest?

10   A.    Absolutely, yes.

11            MS. GREGSON:  Thank you.

12            MR. CARNEY:  Nothing further.  Thank you, Your Honor.

13            THE COURT:  I just have one question.

14            THE WITNESS:  Yes, ma'am?

15            THE COURT:  Was the marijuana bag that was in the map

16   pocket, was it open or was the seal broken?

17            THE WITNESS:  It looked like it was open, yes.

18            THE COURT:  That's all I had.

19            THE WITNESS:  Okay.

20            THE COURT:  Anybody else?  Can we excuse the witness?

21            MS. GREGSON:  Thank you.

22            THE COURT:  Thank you.

23            THE WITNESS:  Thank you.

24            THE COURT:  I assume those are the only two witnesses,

25   correct?

1          MS. GREGSON:  Yes, Your Honor.

2          THE COURT:  I'll hear argument, then.  Mr. Carney,

3     I'll start with you.

4          MR. CARNEY:  Your Honor, I'd like to use your time as

5     efficiently as possible.  I know that you've had the opportunity

6     to review the pleadings, you understand the issues, you've

7     reviewed the video and the other exhibits in the case, so I

8     don't want to belabor any points, but I do think that it's worth

9     saying that we stand by the arguments that we made in all of the

10    pleadings relevant to the motion to suppress.

11          Mr. Russell had every right to continue driving away.  At

12    no point did either officer develop probable cause to believe he

13    committed a traffic infraction related to his driving or observe

14    any driving that was consistent with him having been impaired.

15          Officer Lentz just admitted that, based on everything they

16    had seen, he could not form the conclusion that there was

17    probable cause to arrest for DUI at the moment that he was asked

18    by Officer French.

19          Nothing that occurred following that could have resulted in

20    the sudden formation of probable cause, either.  All that

21    happened was that he was ordered to get out of car and continued

22    to have a conversation, where he denied being impaired and

23    offered to do field sobriety tests.  At no point did this

24    investigation ripen into probable cause for marijuana DUI.

25          The government has cited cases, including the *Gearhart*

1    case, that suggests that the fact that they smelled marijuana

2    constituted probable cause.  That would be a mischaracterization

3    of the holding of *Gearhart*.  The defendant in *Gearhart* was not

4    arrested for DUI.  And, in fact, the only thing the court said

5    about the odor of marijuana was that it was a basis to continue

6    investigating; a *Terry* stop basis, not probable cause.

7         The controlling authority in this case is the case cited in

8    my briefing, which is the *Patzer* case, 277 F.3d 1080, which is

9    almost identical.  In that case, the officers observed that he

10   had bloodshot and glassy eyes and smelled marijuana.

11        The Ninth Circuit says that that's not enough.  You have to

12   look at the driver's comportment and driving to determine

13   whether or not that adds up to probable cause.

14        Officer Lentz just admitted that the driving didn't

15   constitute probable cause for DUI, and having watched the video,

16   I would consider it fairly clear that there was no evidence of

17   driving that suggested impairment.

18        I would invite the court to draw its own conclusions about

19   whether or not Mr. Russell's comportment justified a conclusion

20   of probable cause to arrest, particularly in the several seconds

21   between the moment when Officer French asked Officer Lentz

22   whether he saw probable cause and Officer Lentz denied seeing

23   probable cause.

24        So there couldn't have been a basis to arrest for marijuana

25   DUI.  From that flows the conclusion that the warrant did not

 1   establish probable cause and that the blood draw should be

 2   suppressed.

 3        Moving to the gun.

 4        Neither officer at any point showed any interest in

 5   investigating any of the myriad traffic infractions that they

 6   claim to believe Mr. Russell committed.  At no point did they

 7   investigate those, follow up on that, issue any infractions, or

 8   do anything that could have constituted an investigation of

 9   those infractions.

10        The law is clear that you can't use a traffic infraction to

11   stop someone and then prolong the stop for other reasons without

12   making any diligent effort to investigate the basis for the

13   stop.  They did not do so.

14        THE COURT:  What about the fact that they smelled

15   marijuana as soon as they approached the car?

16        MR. CARNEY:  At best -- at best that may have

17   constituted a *Terry* stop predicate, but all the cases have said

18   is that smelling marijuana, plus watery, bloodshot eyes, other

19   indications constitute a *Terry* stop.

20        I would suggest that the court again review the video, and

21   ask yourself the question of whether there is anything in any of

22   these videos to substantiate the claim that Mr. Russell's eyes

23   were droopy, watery, glassy, or bloodshot.  There is not.

24        THE COURT:  And what about the fact that there was --

25   the blunt seemed like it was unsmoked, but there was the open

1    package of marijuana inside the compartment?

2         MR. CARNEY:  That is a traffic infraction, at worst,

3    not a basis for arrest.

4         To the extent the initial stop was justified by not seeing

5    the license tag, it's clear and undisputed that there was, in

6    fact, a tag and the vehicle was, in fact, validly registered.  I

7    cited approximately 15 cases in the brief for the proposition

8    that once that discovery was made -- and Officer French conceded

9    that Mr. Russell literally tapped on the window to show him

10   where the tag was -- once that moment occurred, the cases cited

11   in the pleadings stand for the proposition that the stop should

12   end.

13        Moreover, there were multiple unlawful searches of

14   Mr. Russell's vehicle.  Officer Lentz, for whatever reason,

15   would not admit the evidence that our eyes can see, which is he

16   did, in fact, intrude his flashlight and hand into the passenger

17   compartment of the vehicle to look around.  He's not allowed to

18   do that.  I cited the cases in my brief that stand for that

19   proposition.

20        He's also not -- neither of them is authorized to take

21   control of the door.  They're not authorized to move anything

22   even a few inches without having committed a search.

23        So when Officer French arrives and pushes the door further

24   open, his act of pushing the door further open without gaining

25   or seeking consent is a search.

1          THE COURT:  Although at that point it seems like he

2     can clearly see, again, the marijuana and, you know, the blunt

3     in the driver's seat map pocket.

4          MR. CARNEY:  Uh-huh.

5          THE COURT:  So did that extend his, you know, the stop

6     and make it a legitimate investigation into a DUI?

7          MR. CARNEY:  Not to a DUI, no.  I would say that there

8     was the possibility of an infraction for an open container,

9     something of which the officer showed no interest in at all.

10    But, no, under the cases cited in the pleadings, there was not

11    probable cause to arrest based on the fact that there was

12    marijuana in the vehicle.

13        So the point that I'm trying to get to, Your Honor, with

14    the door is that Officer Lentz's testimony was clear that he was

15    looking using his flashlight and by intruding -- I would

16    submit -- and by intruding his hand into the passenger

17    compartment of the vehicle for the purpose of locating a weapon

18    throughout his interaction with Mr. Russell.

19         THE COURT:  But that's not when he saw the gun.

20         MR. CARNEY:  Exactly, because he didn't see it until

21    Officer French pushed the door further open, an act constituting

22    a search for which there was no warrant and no consent.

23         THE COURT:  Okay.  But are you trying to make any

24    point about his arm going in?  Because you asked several times

25    about his arm crossing the plane, maybe, and the flashlight

1   going in, but, like, nothing was found at that point.  So I was

2   a little bit trying to figure out why you were asking about

3   that, to be honest.

4          MR. CARNEY:  For a couple of reasons, Your Honor.

5   First, it indicates the officers are exhibiting a show of

6   authority to Mr. Russell.  They are clearly communicating to

7   him, We're going to do what we want to do.  If we want to reach

8   into your car, we're going to do it; we're not going to ask you.

9   If we want your door open or closed or moved or in any way

10  manipulated to allow us to view inside your car in whatever way

11  we want to, we're going to do that.

12         They made no effort to consult him about what he was

13  authorizing them to do or not to do as far as the search of the

14  vehicle was concerned.  They simply did it.

15         And it's worth noting that even while putting his hand

16  inside the car and using the flashlight, Officer Lentz didn't

17  find anything.  He only found it because Officer French engaged

18  in an unlawful search.  That was very clear from his testimony.

19  He couldn't see the gun until Officer French, without asking

20  permission and without probable cause, moved the door out of the

21  way.

22         So defense position is that both the gun and the blood draw

23  should be suppressed.

24         THE COURT:  Thank you.

25         MS. GREGSON:  Well, first, I think it can't be argued

1    that there was no basis to stop the defendant.  He committed

2    multiple traffic violations that were the basis of the stop.

3         His license was not visible.  His tint was so dark that his

4    license was not visible to the officers.  Additionally, he was

5    standing and stopping in the roadway, and, ultimately, didn't

6    yield to the right and stayed in the left-hand lane.  So there

7    were lots of reasons to contact him, and those were some of the

8    reasons that they, ultimately, did.  So it was an appropriate

9    stop.

10        And while we're talking about the stop, I do not agree that

11   any of the body-worn camera footage that was shown to Officer

12   Lentz established that his hand crossed any plane.  Although I

13   do agree with the court that he didn't observe anything when he

14   was using his flashlight to see, but I don't think that's

15   definitively observable, and I would ask the court to make that

16   finding.

17        THE COURT:  So I agree that there clearly was a basis

18   for the initial stop -- right? -- an investigation.  One thing I

19   wasn't aware of until Officer French testified is he says he did

20   see the tag when Mr. Russell pointed to his window.  So at that

21   point, shouldn't --

22        MS. GREGSON:  Absolutely not.  They had already

23   smelled marijuana when they approached the windows.  That became

24   a DUI investigation.  That is the testimony that the court

25   heard.  Additionally, it's still a problem that it's not

1    visible.  It's still an infraction that it's not visible.

2        But the testimony before the court is that once Officer

3    French smelled that marijuana, he was now conducting a DUI

4    investigation.  It pivoted.

5        And the government's briefing cites multitudes of cases

6    where that is, in fact, the case; where these DUI stops or

7    traffic violations bleed into other crimes.  And there's,

8    actually, a slew of firearm possession cases, where that is what

9    happened, that I cited to, and I won't regurgitate.

10       Counsel wants you to look at probable cause in a vacuum.

11   "Well, it's this fact and that's not a crime, and it's this fact

12   and that's not suspicious."  That's not what the case law says.

13   The court should consider all of these things that are criminal

14   and noncriminal in the officers' determination of probable

15   cause.

16       And, here, in addition to the slew of traffic violations

17   that were going on, prior to justifying the stop of the vehicle,

18   Mr. Russell, upon initial engagement, had a very strong smell of

19   marijuana emanating from the car, a smell that is consistent

20   with burned marijuana, consumed marijuana.

21       His eyes were watery, bloodshot, droopy, and glassy, was

22   the testimony today.  When he got out of the car, his clothing

23   and his person smelled like marijuana.  The testimony that was

24   in the record is that marijuana dissipates within hours,

25   depending on if the person is walking around outside or in a

1    closed location, like the defendant was with his vehicle here.

2         The effects last hours, according to the testimony of

3    Officer French, who's received training on this.  We also know

4    the defendant admitted to smoking marijuana literally within

5    hours of the stop, although his answers varied with the time

6    frame, the amount, and the hours that passed.

7         He had an open bag of marijuana, which is not legal, also

8    consistent with the smell that the officers both testified to

9    being aware of.  He became increasingly agitated, and I would

10   describe him as belligerent.  And he, ultimately, refused to

11   walk to the sidewalk and tried to get someone else who had

12   stopped, who was clearly an acquaintance of his.

13         THE COURT:  So I'm going to say, watching the video, I

14   did not think that Mr. Russell was being belligerent.  I think

15   he was trying to enforce his rights and he was getting upset,

16   but "belligerent," I think, is a very strong word.

17         Really what I'd like to turn you to is the *Patzer* case,

18   because you didn't address it in your brief.  And, you know, I

19   think it says there -- right? -- that the Ninth Circuit really

20   focus on driver's driving and compartment, that it wasn't enough

21   to just have bloodshot and glassy eyes and droopy eyelids.

22         So I'm wondering what are you relying on, other than the

23   eyes, you know, which, again, it doesn't look in the video -- I

24   know they say the camera is not really great, but, like, you

25   know, I think I can tell a droopy eyelid.  It doesn't look like

 1    he has droopy eyelids.  So what else is the government relying

 2    on?

 3              MS. GREGSON:  I'm relying upon the smell, upon the

 4    open container, on the smell on his person, the admission of

 5    consuming within hours of being stopped, although that doesn't

 6    necessarily make sense, considering the strong emanating smell

 7    that came from the car and his person when he stepped out.

 8    Those are all --

 9              THE COURT:  But those would all -- I mean, clearly,

10    there's an infraction, but if I'm looking at DUI -- it's not an

11    impairment, right?  They're saying they're looking at the

12    driver's driving and comportment, and I think the officers had

13    said, you know, they didn't really see him swerving.  There was

14    maybe speeding, but they can't really say.

15              MS. GREGSON:  I don't know that there's a single case

16    that requires the driver to be a bad driver in order to be

17    pulled over for an infraction and then discovered to be DUI

18    either by alcohol or by drugs.  There's not a single case that

19    stands for that proposition, Your Honor.

20         It's all of the facts that I've repeatedly said, and I

21    think I called it a constellation of 10 factors that the

22    officers, ultimately, relied upon in order to determine that he

23    was impaired.

24         And he did refuse to walk over to the sidewalk to do the

25    field sobriety tests, and I would call that agitated and

1   belligerent.  He can refuse them.  To do so, obviously, has

2   other consequences with the Department of Licensing.

3        But, ultimately, I do think that there is sufficient

4   probable cause.  We're not talking about beyond a reasonable

5   doubt.  We're talking about probable cause.  And the case law

6   requires the court to give great deference to the magistrates

7   who sign these search warrants.

8        I don't think -- moving to the *Franks* issue -- that Officer

9   French's misstatement of "one hour" versus "two to three" versus

10  "earlier" versus "one blunt" was intentional or reckless.  I

11  think it was just a mistake.

12       The defendant said a lot of different things about his

13  consumption level and the timeframe, and there is probable

14  cause.  Even excluding the admission of marijuana but excluding

15  the one hour wouldn't render the warrants to lack probable

16  cause.

17       And, ultimately, once they did get those warrants, the

18  officers had good faith to execute both of them.  And as we

19  know, there was, in fact, a gun under the seat, and the

20  defendant was, in fact, legally over the limit.

21       So I'm asking the court to deny the defendant's motion, and

22  I will leave it at that.

23       Thank you.

24            THE COURT:  Do you have anything further, Mr. Carney?

25            MR. CARNEY:  Just briefly, Your Honor.

1    I'm sure the court is tracking this, but in my reply brief,

2    I did point out that the *Patzer* case, being almost identical to

3    these facts, defeats any claim of good faith reliance on a

4    warrant that claims to establish probable cause based on facts

5    that *Patzer* has concluded do not establish probable cause.

6    So I would refer you to that argument in the reply brief.

7    They cannot simply say, Well, we relied on the warrant in good

8    faith.

9    Regarding the warrant for the search of the gun, the claim

10    was that it was in plain view, but an unlawful search preceded

11    that view.  And that argument is, again, made in the pleadings,

12    so I would refer the court to those sections of the pleadings.

13    And unless you have any further questions, that's all I

14    have.

15    THE COURT:  I don't have any further questions.

16    MR. CARNEY:  Thank you.

17    THE COURT:  Thank you.  As I said, I'll do my best,

18    and my goal is to get my decision to you by next Wednesday.  But

19    I want to take time to review and think about everything I've

20    heard today.

21    Thank you, all.

22    (Proceedings concluded at 4:47 p.m.)

23

24

25

1

2                        C E R T I F I C A T E

3

4

5              I, Nancy L. Bauer, CCR, RPR, Court Reporter for

6    the United States District Court in the Western District of

7    Washington at Seattle, do hereby certify that I was present in

8    court during the foregoing matter and reported said proceedings

9    stenographically.

10             I further certify that thereafter, I have caused

11   said stenographic notes to be transcribed under my direction and

12   that the foregoing pages are a true and accurate transcription

13   to the best of my ability.

14

15

16             Dated this 13th day of November 2024.

17

18                            /S/  Nancy L. Bauer

19                            Nancy L. Bauer, CCR, RPR
                              Official Court Reporter
20

21

22

23

24

25